**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KATHLEEN WILER, INDIVDIUALLY AND ON BEHALF OF SIMILARLY SITUATED FEMALE COACHES, ADMINISTRATORS AND ACADEMICS CHALLENGING PAY EQUITY | Case No: |
| Plaintiffs, | |
| vs. | COMPLAINT AND JURY DEMAND |
| KENT STATE UNIVERSITY. | |
| Defendant. | |

**COMES NOW** the Plaintiff, Kathleen Wiler, by and through her attorneys, Newkirk Zwagerman, P.L.C., and The Lefton Group L.L.C. and for her cause of action hereby states the following:

## INTRODUCTION

1.    Plaintiff Kathleen Wiler brings this employment discrimination action against Defendant Kent State University for gender discrimination, wage discrimination, and unequal pay based on gender.

2.    Defendant Kent State University created intolerable working conditions for Wiler by failing to remedy her pay discrimination complaints despite notice of her discriminatory pay forcing her constructive discharge.

3.    Defendant Kent State University had actual knowledge of pay inequality based on gender across campus at the time Defendant created intolerable working conditions for Wiler.

4.    The purpose of this action is to redress Plaintiff's rights under Title VII, Title IX and the Equal Pay Act (EPA) as well as the Ohio Equal Pay Law (EPL) prohibiting gender and pay

discrimination.

5.     Plaintiff seeks to recover damages for pay discrimination and seeks equitable relief to prevent pay discrimination for women currently employed at KSU in the role of coach, administrator or academic.

6.     Plaintiff Wiler also brings this action on behalf of herself and similarly situated female employees at KSU (Plaintiffs) against the University.

**Jurisdiction and Venue**

7.     This Court has jurisdiction over Plaintiffs' federal and state law claims pursuant to 28 U.S.C. §§ 1331, 1343, 1367.

8.     This Court has jurisdiction to provide declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.     Venue is proper in the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C. § 1391(b) because the events forming the basis of Plaintiff's claims occurred in Kent, Ohio, which is within the jurisdiction of this Court.

**THE PARTIES**

10.     At all material times, Plaintiff Kathleen Wiler was a citizen of Ohio and an employee of Defendant, Kent State University.

11.     At all material times, Defendant Kent State University (hereinafter "KSU") was an educational institution receiving federal financial assistance and organized under the laws of the state of Ohio.

12.     KSU has discriminated against the Plaintiff and members of the putative class on the basis of gender by paying wages at a rate less than the rate paid to male employees for equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

2

13.     Plaintiff seeks to be appointed by the Court as class representative should this matter become certified as a class action pursuant to Federal Rule of Civil Procedure 23.

14.     Plaintiff Wiler and other members of the putative class have been a) denied equal pay for equal work; b) denied a higher pay rate despite more education, more experience, more work productivity, or stronger work performance; c) have been subject to KSU's policies and practices determining pay and other compensation rates; d) have been denied equal pay for equal work through the operation of gender stereotypes, or e) seek to enforce equitable relief in the form of a Court order requiring Defendant to comply with Title VII, the EPA and Title IX in its pay and compensation employment practices.

15.     The Plaintiff seeks to represent women who have experienced pay discrimination and that have been denied equal pay relative to the work performed compared to similarly situated male employees within the three sub-classes of jobs: coach, administrator and academic on a class-wide basis.  The nature of this violation is continuing, as females employed at KSU are denied equal pay for equal work on a continuing basis with each paycheck they receive.

**Kathleen Wiler**

16.     Kent State University hired Kathleen Wiler in 2006 to be the Head Coach of the Women's Field Hockey Team.

17.     KSU's Women's Field Hockey team is a Division I program.

18.     During her tenure, Wiler became KSU's winningest field hockey coach. Coach Wiler holds program records for both Mid-American Conference regular season titles and MAC tournament titles.  Coach Wiler won eight MAC regular season titles, five tournament titles, and five NCAA post-season appearances, including three consecutive tournament titles from 2014-2016.

19.     In addition to team success, Wiler has had success as a mentor and coach. A five-time MAC Coach of the Year, Coach Wiler has coached six All-American selections, 25 All-Region

3

selections, three MAC Players of the Year and five MAC Newcomers of the Year among her 56 All-MAC selections.

20.     Under her leadership, the women's field hockey program has demonstrated leadership and success in the classroom. At least nine of Wiler's players were named to the NFHCA's National Academic Squad *each season.*

21.     At Kent State University, the average compensation paid to male coaches is $125,291.

22.     Kathleen Wiler's compensation package was approximately $85,496.00.

23.     Wiler was receiving lower wages than the average paid to male coaches but was also compensated the lowest of all full-time male coaches.[1]

24.     Wiler's job as Head Coach of women's Field Hockey is substantially equal to the jobs of male head coaches.

25.     Wiler's job as Head Coach of women's Field Hockey is a job that requires equal skill, effort, and responsibility as the other head coach positions at KSU.

26.     Other than variations in the coaching methods used, the skills required to coach student athletes is substantially similar regardless of the sport or the gender of the student athletes.

27.     Head Coaches at KSU are responsible for job duties requiring substantially similar skill, effort, and responsibilities including but not limited to:    1. Teaching/training, 2. Counseling/advising. 3. General program management, 4. Budget management, 5. Fundraising, 6. Public relations, and 7. Recruiting.

28.      KSU required Coach Wiler to put in more effort than male head coaches in

---

[1] The U.S. Equal Employment Opportunity Commission (EEOC) Guidance incorporates authority that the proper test for establishing a prima facie case in a professional setting such as that of an education institution is whether a female plaintiff is receiving lower wages than the average of wages paid to all similarly situated employees of the opposite sex performing substantially equal work requiring similar skill, effort, and responsibility. See https://www.eeoc.gov/policy/docs/coaches.html.

teaching/training and the counseling/advising of her student athletes for reasons related to gender stereotypes yet paid her less.

29. In contrast, KSU required Coach Wiler to put in at least the same effort as male head coaches in programming, budgeting, fundraising and recruiting.

30. KSU's working conditions were supposed to be similar for all coaches regardless of gender based on the university's non-discrimination in employment policies. See

https://www.kent.edu/policyreg/university-policy-regarding-unlawful-discrimination-and-harassment.

31. Coach Wiler had more difficult conditions than male coaches because of the higher expectations placed on her as a female coach of female student athletes yet KSU provided her less resources and less support than male coaches of men's sports.

32. The fact that a female has *more work or more responsibility and is also paid less than her similarly situated male counterparts,* is not a valid defense to a pay discrimination claim.

33. Coach Wiler complained about her unequal pay and discriminatory working conditions based on her gender prior to filing her EEOC complaint in 2017 and from that point forward (through counsel) until she was forced to resign her position in February of 2019.

34. KSU's non-discrimination policy states that KSU will "Investigate alleged [discrimination] incidents that are reported in an appropriate and timely manner[,]" however, KSU refused to investigate or remedy Wiler's gender discrimination, wage discrimination, and unequal pay complaint.

35. KSU refused to remedy Wiler's complaints and Wiler was forced to resign her position based on the failure of KSU to remedy her pay equity concerns and the continuing acts of pay discrimination. She was constructively discharged on February 28, 2019.

36. In December of 2019, Wiler filed a second EEOC complaint to KSU again refused to

remedy Wiler's complaints.

**Interrelation of Relevant Statutes**

37.     Title VII, Title IX and the EPA—address different aspects of gender discrimination and how it interrelates with the challenge of achieving pay equity for women employed at educational institutions.

38.     The Ohio Equal Pay Law (EPL) mirrors the non-discrimination provisions of these federal statutes.

39.     Title VII forbids discrimination because of sex against any individual in hiring or "with respect to [their] compensation, terms, conditions, and privileges of employment . . . ." 42 U.S.C. § 2000e2(a)(1). Title VII also makes it an unlawful practice for an employer "to limit, segregate, or classify … employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [their] status as an employee . . . ." 42 U.S.C. § 2000e2(a)(2).

40.     Title VII provides a remedy to address the harm from gender stereotypes on pay decisions, as well as to address the effect of policies that appear gender neutral but have an adverse impact on women.

41.     The Equal Pay Act prohibits employers from paying employees at a rate less than employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . . " 29 U.S.C. § 206(d)(1).

42.     The EPA recognizes that the jobs need not be identical, but only substantially equal. 29 C.F.R. § 1620.13(a).  The Equal Employment Opportunity Commission (EEOC) Guidance recognizes that this means a female coach can compare herself to a male coach in another sport. See https://www.eeoc.gov/policy/docs/coaches.html.

6

43.     EEOC Guidance recognizes there is considerable overlap in the coverage of the EPA and Title VII, although the two statutes are not identical. Principally, an employment practice that would violate Title VII would not necessarily violate the EPA. Any violation of the EPA, however, is also a violation of Title VII. 29 C.F.R. § 1620.27(a).

44.     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (1982), which prohibits sex discrimination in educational programs and activities receiving federal financial assistance, also applies to a claims of sex discrimination in employment.

45.     Title IX applies to the employment of coaches, administrators and academics and states "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[]" 20 U.S.C. § 1681.

46.     Federal Title IX regulations specific to employees were promulgated by Congress. *See* 34 C.F.R part 106, Subpart E. *See also N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 512 (1982) ("subpart E regulations promulgated in connection with Title IX are valid").

47.     The U.S. Department of Education also adopted guidance interpreting Title IX to cover and protect employees of educational institutions. Title IX Resource Guide, available at https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.

48.     Title IX's legislative history makes clear that Title IX's gender discrimination prohibition applies to the employment of coaches, administrators and academics. Simpson, Lynda Guild (1981) "Sex Discrimination in Employment under Title IX," *University of Chicago Law Review*: Vol. 48 : Iss. 2 , Article 8;[2] *see also* 14 C.F.R. § 1253.500(a) ("No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or

---

[2] Available at: https://chicagounbound.uchicago.edu/uclrev/vol48/iss2/8

recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient that receives Federal financial assistance.").

49. Title IX regulations make clear that Title IX's gender discrimination prohibition applies to Defendant's employment decisions including, but not limited to, decisions regarding hiring, promotion, consideration for and award of tenure, demotion, rates of pay or any other form of compensation, and changes in compensation. 14 C.F.R. § 1253.500(b)(1)-(10).

50. Defendant publicly acknowledges that Title IX protects its employees as its website makes clear that Title IX applies to both the areas of education *and employment*. See https://www.kent.edu/sss?spotsearch=true ("While it is often thought of as a law that applies only to athletic programs, Title IX is much broader and protects all students, *employees*, and visitors to campus from gender discrimination.") (emphasis added).

### Pay Equity Cannot be Achieved without Addressing all Sources of Wage/Pay Discrimination

51. Title VII and the EPA both address different ways that women end up with lower wages while performing the same work (or more work) than their male peers. However, Title IX expressly recognizes what Title VII and the EPA imply, which is that there are pre-existing structural differences that create barriers to achieving equal pay for women.

52. Title IX recognizes, for example, that women may hold lower paying positions because there are fewer employment opportunities that exist for them. For example, women are not normally hired to coach men while men are regularly hired and often recruited to coach women. Female academics are less than fully represented in STEM positions. These are examples of pre-existing structural barriers that are the result of gender stereotypes or gendered socialization and cannot form part of the decision-making process that results in paying women less than men.

53. Kathleen Wiler is a female coach who was paid the lowest of any of Defendant's coaches, most of whom were male. Wiler was excluded from coaching males and therefore had less

access to coaching opportunities that are more highly valued—coaching male student athletes.  Wiler was also paid less because she was subjected the effect of gender stereotypes that devalued her pay at the time of hire, during consideration of raises/contract extensions and in the evaluation of work performed and success obtained, relative to her male peers. Correspondingly, these same stereotypes cause Defendant's decisionmakers to overvalue the work, skill, efforts, responsibility and success of male coaches resulting in unequal pay based on gender.

54.     The sources of these gender stereotypes are:

a.  <u>Leadership/lack of fit/role incongruity bias</u>. The role of head coach, university administrator and academic is still viewed as a male-type task or leadership role. We value the work of males acting in that leadership role more than females. This results in more pay for a male and less pay for a female when acting in that role.

b.  <u>Family care/not career bias</u>. Stereotypes confirm that a female's expected role is to care for her family first and her career second. We have the opposite expectation for males. When a female appears focused on pursuit of her career over family she will be devalued. This results in pay differences.

c.  <u>Service work/Support bias</u>.  These stereotypes result from the expectation that a female is required to perform service-related tasks that are not normally performed by a person acting in a "leadership" role.  A female academic may be expected to perform more "service" work--working with students or carrying a heavier teaching load. A female head coach may be required (and expected) to spend more time nurturing or managing the emotional needs of her athletes. In addition, many universities expect that this work be performed in addition to normal job duties, yet the female will not receive the necessary support (administrative help or resources) and/or will not be rewarded for performing extra tasks in their pay.

d.  <u>Negotiation bias/Backlash</u>.  Stereotypes suggest males are expected to take affirmative steps to seek advancement or increases in pay.  The flipside is true for women. Women who ask for raises are therefore more often denied and the mere fact that they asked for a raise can result in backlash.

55.     Wiler brings individual claims and class claims for disparate impact where specific policies and practices at KSU have created pay disparities for female coaches, female administrators and female professors. There are five specific practices that often affect pay decisions.

a.  <u>Reliance on the "Market"</u> or Revenue Production: The practice of relying on alleged market rates – what the market feels a coach or administrator or academic is worth-- or the practice of relying on expected or claimed revenue production.

9

b.  Retention/Outside Job Offer:  The practice of permitting or requiring employees to justify pay raises because they obtained or sought an external offer of employment.

c.  Prior Salary History: The practice of considering prior salary in setting internal salaries for academics, coaches or administrators at the time of hire.

d.  Reliance on Invalid/Subjective Rationales:  The practice of not creating standards for the evaluation of pay and/or the practice of picking and choosing subjective reasons to increase pay or deny an increase in pay.

e.  Failure to Address Stereotypes and Implicit Bias:  The practice of failing to proactively address the role of gender stereotypes, gender socialization and implicit bias in pay decisions and, separately the effect of such biases in the assessment of the need for, or application of, the practices listed above.

56.     While other specific practices may exist at KSU these five common practices will normally have an adverse impact on females working in male-type or leadership roles (coach, administrator, or professor).

57.     Several of these practices provide an insurmountable advantage for males at the expense of their female counterparts.

a.  Males have more access to jobs (e.g. jobs coaching men) that have long been valued more highly in part, because women were excluded from those jobs. These differences will positively impact a male's past salary history, perceptions of his market value and the ability to earn revenue in their sport.  These differences create access to higher pay for males compared to females within the university regardless of whether their work, effort and responsibility are equal.

b.  Males are more comfortable seeking outside job offers because of socialized differences between men and women, but also because males benefit from their efforts more easily and males do not suffer backlash during negotiations in the same way as females.

c.  Males are not at the same risk of negative gender stereotypes as females that will exist in other universities and that will negatively affect both whether a female is offered an outside job and if so, the amount of pay connected to the job offer.

58.     EEOC guidance recognizes that advantages based upon gender stereotypes or that exist because of socialized differences based on gender (unless job-related and scientifically validated) cannot be a factor other than sex.

10

59. Job market advantages based upon gender stereotypes cannot be used as a defense to a claim of pay discrimination because they also directly violate Title IX.

60. KSU has not engaged in any scientific study of whether these practices (in particular reliance on the market, or outside job offers) are in fact, job related and survive assessment of their content/criterion validity.

61. Because these practices are not validated or job-related, they cannot be used as a defense to a claim of pay discrimination under Title VII or presented as a "factor other than sex" as a defense to the EPA. These practices also would directly violate Title IX.

### Evidence of Gender Stereotypes and the Resulting Adverse Impact in the Assessment of the Quality of Performance.

62. The reasons why a female coach is paid less than the males often has little to do with an assessment of skill, effort, or responsibility. Pay differences are often based on gender-driven assumptions about how much we are "supposed" to pay a male coach of a male sport and/or assumptions that retention of one male coach is worth more than the retention of a female coach.

63. One assumption is often that a sport is revenue producing. There are no sports at KSU that are revenue producing in the sense that would justify increasing the pay of a coach to reward that revenue or that is a valid factor other than sex.

64. Stereotypes cause a university to focus on whatever specific difference happens to exist between men and women to then use as the justification for the pay difference. Here, there is little difference in the skill effort and responsibility for coaches at KSU.

65. Avoiding those assumptions and stereotypes is why a university has an obligation to review any reasons it uses to pay men more and ensure they are both job-related, necessary and scientifically validated.

66. There can be differences in what each coach has accomplished within their sport. Performance – the quality of work, or the success achieved within a sport or academic field can be a

factor other than sex to pay coaches differently.  An examination of performance in the context of skill, effort and responsibility of coaches at KSU shows that Coach Wiler was not paid equally.

67.    In addition to individual success of players or academics, there other metrics represent measures of professional success. These include, success within the division, here the Mid-American Conference (MAC), success in the NCAA tournament and recognition within the profession, such as Coach of the Year honors.

68.    One way to expose the failure to pay the female equally to the males given the amount of work—skill, effort, responsibility, and then quality of work—performance as a coach is to examine the success within certain metrics of Coach Wiler compared to other males in 2016, the academic year ending immediately prior to filing her first EEOC complaint.  By comparison to the listed males in the following paragraphs, Coach Wiler's compensation package in 2016 was $85,496.

69.    In 2016 Coach Wiler was among KSU's five MAC Coaches of the Year. The males who also accomplished this were Jeff Duncan, baseball; Herb Page, director of golf; Roberto Marinaro, women's soccer; and Eric Oakley, Softball:

    a.    The average compensation of these males who similar skill, effort, and responsibility but who were performing at Coach Wiler's level on this metric was $145,436. Those males were earning, on average, $60,000 more per year.

    b.    The average pay of the males who were <u>not</u> performing at this high level on (excluding football and excluding cross-country) was $127,406.[3]

70.    Coach Wiler's team was among six that were the MAC regular season champions; the male coaches with championship teams were Duncan, Page, Robertson, Biggin and Oakley.

    c.    The average compensation of these five males performing, on this metric, on a level similar to Coach Wiler was $136,028, or an additional $50,000 per year.

    d.    The average compensation of the males not performing at this level was $149,565.

---

[3] Football and cross country were not performing at this high level, but we exclude football and exclude cross country for this analysis.

71.    Coach Wiler's team won the MAC Tournament and only one other coach, Marinaro, accomplished that.

    e.   Coach Wiler was paid $85,496 and Coach Marinaro was paid $95,554.

    f.   The average compensation of males who did not win the MAC Tournament was $157,143.

72.    Coach Wiler's team also appeared in NCAA competition as did the teams of three male coaches: Page, Robertson and Biggin.

    g.   The average pay of the three coaches performing at her level was $128,777.

    h.   The average pay of the other male coaches not performing at this level was $160,455.

73.    At that time only one other coach, Page, had as many MAC and NCAA accomplishments as Wiler did in 2016.  In 2016 Plaintiff Wiler was in the top two of success, but was the only female coach, sixth in seniority, but 12th in total pay, out of 14.[4]

74.    A review of accomplishments shows that Coach Wiler maintained this success.

    i.   Wiler has been MAC Coach of the Year five times. Only two other coaches have topped that: Page with eight and Lawson with six.

    j.   Wiler's team has been the MAC Regular Season Champs eight times. Only two coaches top that, Lawson with ten and Page with nine).

    k.   Wiler's team has been the MAC Tournament Champs five times, tying only a former baseball coach Scott Stricklin for the most.

    l.   Wiler's team has appeared in NCAA competition five times. She is equaled in that by two coaches, Stricklin and Robertson. They have been topped by Page with ten appearances, Biggin with nine and Morrow with seven for his women's golf team.

    m.   Wiler is at or near the top in most of categories of success compared to all coaches and even when compared to coaches of sports (football, basketball, baseball that

---

[4] Mark Croghan was called the head coach for men's cross country but Croghan was treated -- and paid -- in organizational charts like an assistant coach and when he moved to facilities manager, an assistant coach was hied to replace him. Softball coach Eric Oakley had a slightly smaller base pay than Wiler in 2016, but got $31,000 in "additional" pay. With the additional pay, Oakley shoots up from 13th to 9th in earned income for 2016 and Wiler falls to 13th, even though her team had an outstanding year.

receive the most support and backing by KSU), who don't beat her in any of them.

75.     Coach Wiler's average pay has always be lower and substantially lower than the average of the males whether they have similar or even far less success given equal skill, effort and responsibility.

76.     Because KSU does not employ objective standards as to why it will raise the base pay or add compensation to coaches, this creates ambiguous information.  KSU then will provide raises or deny them based on the assessments (valuation) of the work or performance of a coach.  Gender stereotypes will cause a university to overvalue this information relative to a female.[5]

77.     KSU also did not scientifically validate any of its decision-making processes with regard to pay and this also created ambiguous information that was likely affected by stereotypes.

78.     Coach Wiler's initial EEOC charge was filed on August 31, 2017, and initially supplemented on February 26, 2018.  Since that time, KSU has eliminated the position the only woman in the Athletic Department who was paid more than Coach Wiler.  At the time Coach Wiler left KSU there were ten people in the Athletic Department who are paid between $100,000 and $500,000 per year.  Every single one is a man.  There are nine more people in the Athletic Department who are paid between $80,000 and $99,999 per year.  Every single one is a male.

**Commonality:**

**Coaches, Administrators & Academics Face the Same Sources of Pay Discrimination**

79.     One source of commonality between Kathleen Wiler and female administrators and female academics are that these jobs are all male-type tasks or leadership roles affected by the same gender stereotypes—Lack of Fit, Family Care v Career, Service/Support, and Negotiation Backlash.[6]

---

[5]  EEOC Guidance recognizes that a female coach must look to the average pay of male comparators to establish her prima facie case in part for this reason.  Gender stereotypes always justify a difference in pay when factors are examined in a vacuum.

[6]  "The perceived lack of fit between the requirements of traditionally male jobs and the stereotypic

80.     These gender stereotypes and the failure to account for them are what continue to create pay imbalances for women.  Females employed at KSU – whether head coach, administrator, or academic--are all subject to the same four categories of gender stereotypes described herein.  These stereotypes also affect how a university applies its specific practices such as when to use or how to value assessing market rate, revenue production or past salary.

81.     Another source of commonality between these three sub-classes of female employees at KSU is that they are affected by the same specific pay practices--Reliance on the Market/Revenue, Outside Job Offer, Prior Salary History, Invalid/Subjective Rationales and Failure to Prevent the Effects of Stereotypes and Implicit Gender Bias.

## **Commonality:**

## **Coaches, Administrators & Academics Face Gender Segregation & Gender Stereotype Barriers**

82.     Within KSU, there are two separate ways that gender affects women and therefore their pay.  One way is the effect of gender bias and policies that have an adverse impact on women in the assessment of performance or value within those leadership roles. The second way concerns the effects of long-standing and continued segregation of women in coaching and other leadership roles.

83.     Title VII, the EPA and Title IX all prohibit official or unofficial sex segregation affecting hiring decisions or pay decisions.  Segregation creates the source of inequality and stereotypes and also continues to further the perception of inequality and the effect of gender biases that result and effect pay decisions.

84.     Wage classification systems that designate certain jobs as "male jobs" and other jobs as "female jobs" frequently specify markedly lower rates for the "females' jobs." Such practices

---

attributes ascribed to women is therefore likely to produce expectations of failure. Moreover, the greater the degree of stereotyping or the more masculine in sex-type the job, the worse the perceived fit and the more negative the expectations are apt to be."  Heilman, *Description and Prescription: How Gender Stereotypes Prevent Women's Ascent Up the Organizational Ladder*, Journal of Social Issues, Vol. 57, No. 4, pp. 657–674 (2001).

indicate a discriminatory pay practice based on sex.

85.     Even today, many jobs remain segregated by gender and will hold a different value to employers because of the effective segregation within that job.  In the past, professions of all types that had either a higher status or higher pay (professions) were sought and held largely by males. Both then and now, such jobs were viewed as "male-type" jobs.  Both then and now, jobs defined as "male-type" were highly valued, and jobs defined as "female-type" were, and are, undervalued. [7]

86.     It is an unlawful employment practice under Title VII of the Civil Rights Act of 1964 to classify a job as "male" or "female" unless sex is a bona fide occupational qualification for the job. 29 U.S.C § 1620.13(b).

87.     There remains an unjustified and disturbing one-way segregation in athletics.  Athletics effectively designates coaching men, as a male job. Even today, only about two or three percent of male teams are coached by a female while men coach more than half of women's teams.[8]

88.     Any pay decision that rests, in part, on the continued segregation of men and women or the de facto policy separating male-jobs from female-jobs is a per-se violation of the law.

89.     There is an expectation within athletics that women cannot or should not coach men and that creates barriers that deter women from applying to coaching positions, that prevent athletic directors from recruiting women, and that would create a very difficult work environment for the

---

[7] Work done primarily by women is rewarded less than work done by men. This has been documented for broad occupational categories and for specific job titles in work establishments. Such pay penalties result from widespread cultural de-valuation of women's work as both women and men tend to assign more worth and prestige to work performed by men. Additionally, those skills closely associated with women's work, such as nurturance, are systematically under-rewarded. Cohen, Individuals, Jobs and Labor Markets: *The Devaluation of Women's Work*, American Sociological Review, Vol.  68:443-463 (2003).

[8] As of 2014, the data showed that 57.1% of women's teams are coached by males.  Acosta and Carpenter, *Women in Intercollegiate Sport* (2014).  Statistics from the NCAA (2004) and from the Acosta and Carpenter longitudinal study (2006) show no change over the last several decades in the percentage of women coaching men's collegiate sport teams (2-3%).

female if she was ever hired.[9]

90.     At KSU, there are no women coaching men and only two sports are currently coached by women.

91.     Since 2006, when Wiler was hired, there have been 26 head coaches in the various sports KSU offers, but only five have been women. No women have coached the men's sports, but for most of that period, men have been at the helm of all of the women's sports except field hockey and the newly created lacrosse team. When a male coach leaves, he is normally replaced by a man. When a female coach leaves, she is most often replaced by a man.[10]

92.     The continued segregation of athletics is not necessary and results in harm to female athletes.[11]

93.     This segregation and expectation also reflect the power of gender stereotypes. Women play most of the same sports as men yet they have made almost no progress in coaching the sports

---

[9] "Women as head coaches of men's sport teams face unique barriers and challenges, including job access barriers, workplace discrimination, the gendering of the coaching role, and agency barriers. The findings suggest women are not applying for coaching positions of men's teams because the jobs are not open to them, lack of societal support, lower salaries, and athletics directors are not recruiting/hiring women. The findings suggest the low number is not due to lack of interest, qualifications, or experience. **Women coaching men face negative treatment based on gender, including by other coaches, parents, student-athletes, and administrators**." Yiamouyiannis, *Occupational Closure in Intercollegiate Athletics: Female Head Coaches of Men's Sports Teams at NCAA Colleges*, Dissertation The Ohio State University (2008).

[10]   For example, when Mora Kanim left in 2006 after 10 years as women's volleyball coach, she was replaced by Glen Conley, a man; when Conley left in 2012, he was replaced by another man, current coach Don Gromala. When KSU decided in 2012 not to rehire longtime women's basketball coach Robert Lindsay, it broke with tradition by hiring Danielle O'Banion in his place, but when she left four years later, the school reverted to form and replaced her with a man, current coach Todd Starkey. When longtime women's golf coach Mike Morrow left in 2013, he was replaced by Greg Robertson. When longtime softball coach Karen Linder resigned in 2015 she was replaced by a man, current coach Eric Oakley.

[11] "Imposing sex segregation on sports is problematic for many reasons. Sex segregation reflects and reinforces a binary view of both sex and gender unsupported by science. It communicates that women are physically unable to compete against men, even though research indicates considerable variation among individual athletes and different sports, and further reveals that attributes other than sex are often more important determinants of athletic ability. It reinforces unfounded gender stereotypes that harm both women and men. And sex segregation uncritically prioritizes athletic activities involving strengths typically associated with male bodies, without requiring us to ask why we view these strengths as the most important in the first place." Leong, *Against Women's Sports*, Washington University Law Review, Vol 95:1 (2018).

they play a the collegiate (or professional) level.  Men, however, are not so limited.

94.     It is not uncommon for male coaches that never played the sport they coach and yet, being successful and perceived as successful as a coach. [12]

95.     There is nothing that should prohibit females from coaching men and nothing to justify such a view as a bonafide occupational qualification.[13]

### Gender Segregation in Academics and Administration

96.     Despite the fact that women have equalized academic credentials at all levels as of 2007, the segregation of academic and administrator roles has continued. [14]

97.     By 2012, about 86% of all presidents, provosts, and chancellors were male, and 75% of full professors were males.   Additionally, data indicates female professors, when compared to males, move up the career ladder slower, have heavier teaching loads, and have lower salaries.

98.     The examination of 1,445 colleges and universities in the United States reveals that while women earn more than half of all Ph.D. degrees granted to American citizens today, they still

---

[12]  See https://bleacherreport.com/articles/2038878-top-10-college-football-head-coaches-who-never-played#slide0

[13] Strong stereotypes remain suggesting women are not as effective as male coaches and that women cannot coach men.  However, there is no evidence to suggest women cannot or should not coach men. There is nothing to justify such a view as a bonafide occupational qualification.  Darvin et al, *Are Men Better Leaders? An Investigation of Head Coaches' Gender and Individual Players' Performance in Amateur and Professional Women's Basketball*, Sex Roles, 78:455-466 (2018)

"For example, specific to the head coaching role,  Cunningham and Sagas (2008) found not only that women have less access to positions as head coaches, but also that when women are able to obtain these positions, they are **not treated with the same level of respect that their male colleagues are afforded**. Processes such as these reinforce the subconscious formation of leadership stereotypes and serve to perpetuate sport as a gendered space. These **stereotypes often exist despite a lack of evidence and objective measurements of coaching performance**. "

"Based on our results and other findings (e.g., Berri et al. 2009) that have examined the impact of head coaches on teams' and players' performances, it appears that **both men and women are readily equipped for success in the coaching profession** (and in some cases, **women coaches have been more successful than the male coaches they replace**; Aicher and Sagas 2010). As such, our results imply that **the absence of women coaches for men's teams is not grounded in any objective or reliable evidence."**

[14] 77.7% of athletic directors are male. Acosta and Carpenter, *Women in Intercollegiate Sport* (2014).

comprise only about 45% of tenure-track faculty, 31% of tenured faculty, and just 24% of full professorships in 2005-2006 (West and Curtis , AAUP Faculty Gender Equity Indicators, 2006).

99.     More women than men are in part-time or non-tenure track positions, and the increasing scarcity of women as you look at higher academic ranks is clearly shown. Participation of women is lowest in the doctoral-granting institutions, where women constitute just 34% of full-time faculty, 26% of tenured faculty, and 19% of full professors.[15]

100.     A number of studies have shown that women and men employed in academia experience their work environments differently—largely in ways that are less favorable to women. Research has indicated that women receive lower salaries, and fewer resources such as research space.

101.     On average, women faculty perform significantly more service than men, controlling for rank, race/ethnicity, and field or department. Guarino & Borden, Faculty Service Loads and Gender: Are Women Taking Care of the Academic Family?, Res High Educ, 58:672-694 (2017)

**Commonality: Coaches, Administrators & Academics Face Pay Inequality at KSU**

102.     Women as a whole continue to endure unequal pay for equal or often more work.  The pay gap has narrowed since the 1970's, but progress has stalled.  In 2013, women working in the United States were still paid 78 percent of what men were paid, a gap of 22 cents on the dollar.   In the most recent analyses, when comparing the median earnings of all U.S. women and men working full-time, women earn $0.80 annually and $0.83 hourly to every dollar earned by men.   At the current rate of progress, most experts estimate that it will take between 41 and 101 years for women to achieve equal pay with men.

103.     At KSU, there are indicators of pay discrimination for all three subclasses of women.

    d.  Within athletics, male coaches are paid, on average, $256,000 compared to the $96,000

---

[15] Green et al, The Prevalence of Women in Academic Leadership Positions, WEPAN, 2008 National Conference, (2008-5-23).

for females. (KSU's 2018 Equity in Athletics Disclosure Act (EADA) Data Report).

    e. Within athletic administration, females are primarily employed at lower level positions and subsequently lower paid positions.

    f. Within academics, males are paid between $2,000 and $12,000 more on average for all positions – Full, Associate or Assistant Professor. (AAUP Faculty Survey 2019)

104. Today, the majority of colleges and universities provide higher average pay for males in the position of full professor, associate professor and assistant professor. At every level of academic achievement, women's median earnings are less than men's median earnings, and in some cases, the gender pay gap is even larger at higher levels of education.[16]

105. In KSU's athletic department, women hold 49 positions (38 percent), but only six (12 percent) are in the top one third of pay. Women are disproportionally stuck at the bottom of the pay scale, with 18 (37 percent) landing in the middle third and 25 (51 percent) landing in the bottom third.

106. One example at KSU is the difference in pay and position for administrators at KSU is Dr. Janet Kittell. Dr. Kittell has a doctorate degree and more than 30 years' experience in intercollegiate administration and coaching. Her title, before it was eliminated, was Deputy Director of Athletics – Internal Operations/ Senior Woman Administrator. Casey Cegles (male) was hired at KSU as the Deputy Athletic Director of External Operations about three years ago. Mr. Cegles does not have a Ph.D. Mr. Cegles' bio oddly mentions that his father, Vic Cegles, has been an athletic administrator for nearly 30 years. His bio also mentions careers of father and his brother.

107. Dr. Kittell was being paid only $2,142 per year more than Mr. Cegles – despite more than 30 years of experience and a Ph.D. ($109,242 for her compared with $107,100 for him.)

108. This is a prime example of how gender stereotypes devalue a female's actual

---

[16] AM. ASS'N OF UNIV. WOMEN, THE SIMPLE TRUTH ABOUT THE GENDER PAY GAP 4 (2d ed. 2017), https://www.aauw.org/aauw_check/pdf_download/show_pdf.php?file=The-Simple-Truth

accomplishments or credentials, and separately exaggerate subjective factors or claimed accomplishments in males.  While KSU paid Dr. Kittle *technically* more than Mr. Cegles, he was valued much closer to her level because of his gender.  In effect, KSU is discounting Dr. Kittell's 30 years of actual experience while at the same time giving Mr. Cegles credit for his father's 30 years of experience.

### PROCEDURAL REQUIREMENTS

109.    In August of 2017, Ms. Wiler filed her first charge with the EEOC to put KSU on notice of her concerns regarding potential equal pay violations. In December of 2019, Ms. Wiler filed a second EEOC complaint to ensure that the passage of time (from the date of her first complaint through her termination) did not prohibit recovery for damages and to pursue all aspects of the practices and policies that impacted pay equity at KSU.   All claims in this lawsuit have been properly preserved via either the first and/or second EEOC complaints.

110.    Plaintiff obtained a Right to Sue letter on the first EEOC complaint and anticipates receiving a Right to Sue letter on the second complaint.  Any claims preserved under the second EEOC complaint are filed to ensure that all related claims are brought in the same complaint.

111.    Plaintiff has suffered emotional distress in past and future as well as lost wages from her date of hire to the date of her constructive discharge and has endured lost wages based on her constructive discharge into the future.

### CLASS ACTION ALLEGATIONS

112.    Plaintiff Wiler brings this action on behalf of herself and on behalf of a class of all those similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2).

113.    All class members are aggrieved persons under federal and state civil rights laws as a result of the actions, policies, and practices of Defendant Kent State University. Plaintiff seeks declaratory and injunctive relief on behalf of herself and all class members to prevent Defendant from engaging in continuing illegal, discriminatory pay practices and to rectify the effects of present and

past discrimination.

114.    This matter is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2).

115.    The class members are so numerous as to make the joinder of all of them impracticable. On information and belief, there are more than 50 female employees at KSU, a substantial number of whom are paid less than their male counterparts in similar positions in athletics, administration, and academics whose job duties are equal or require substantially similar skill, effort, and responsibility whose joinder in this action is impractical.

116.    There are questions of law and fact common to the class members. Among the questions of law and fact common to the class is: (1) whether the practices and conduct of Defendant, as described below, violate the class members' right to enjoy equal pay for equal work; and (2) whether Defendants violate the rights of the class members under Title IX, Title VII, the EPA, and Ohio's civil rights statute by refusing to pay women equal to men that perform the same (or less) work. These common questions of law and fact predominate over questions affecting individual class members.

117.    The Plaintiff seeks to represent a class of all present female employees at KSU who are harmed by Defendant's actions alleged herein and want to end KSU's sex discrimination in pay, compensation, and benefits rates. Thus, the claims or defenses of the representative parties are typical of the claims or defenses of the class.

118.    The Plaintiff seeks to represent the proposed class because joinder of all class members and all persons harmed by the ongoing sex discrimination in Defendant's pay practices is not just impracticable, but impossible.

119.    The proposed class is known to exist, but the identity of its members is unknown and may change during this litigation because of the nature of college employment practices. Some female employees serve in at-will capacities or are subject to renewal of term-contracts, and not all academics

are tenure track or tenured. Accordingly, the members of the class harmed by Defendant KSU's discriminatory actions constantly change as employment relationships and contracts change and as new employees are hired making joinder impracticable.

120.    Joinder is impracticable because the class includes members whose identities are not currently known. On information and belief, there are present female employees at KSU whose names are currently unknown but who would seek to be paid equally to their male counterparts if Defendant did not intentionally discriminate in its pay practices.

121.    The plaintiffs satisfy the "commonality" requirement of Federal Rule of Civil Procedure 23(a)(2) because they share questions of law and fact in common with the proposed class, particularly whether Defendant KSU is violating Title IX, Title VII, the EPA and Ohio state law by failing to provide female with equal pay for equal (or more) work. Because these statutes require comparison of male and female employees in athletics, administration and academics as a whole, the equal pay issues in this action are inherently class-based.

122.    The plaintiffs satisfy the "typicality" requirement of Federal Rule of Civil Procedure 23(a)(3) because their claims are typical of those of the proposed class. They all have been denied, are continuing to be denied, or will be denied equal pay for equal (or more) work by Defendant KSU because of its ongoing intentional sex discrimination in its pay and compensation decisions.

123.    Each plaintiff is a member of the proposed class in that she has been and continues to be denied equal pay for equal (or more) work at KSU.

124.    Plaintiff will fairly and adequately represent the interests of the class pursuant to Federal Rules of Civil Procedure 23(a)(4). She intends to prosecute this action vigorously in order to secure fair and adequate injunctive relief for the entire class.

125.    The Plaintiff satisfies the requirement that class certification would be superior to other methods available for the fair and efficient adjudication of the controversy required by Federal

Rule of Civil Procedure 23(b)(2) because Defendant KSU has acted or refused to act on grounds generally applicable to the class—denying female employees equal pay for equal (or more) work, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole.

126.     Undersigned counsel has devoted substantial and sufficient efforts to identify and investigate potential claims in this action, to developing knowledge of the applicable law, and has sufficient resources to commit to representing this putative class as interim counsel under Federal Rule of Civil Procedure 23(g)(3) until such time as this Court determines whether to certify the action as a class action. They are represented by counsel with extensive experience in Title IX, civil rights, civil liberties, and class action litigation. They intend to vigorously prosecute this action to obtain the relief sought on behalf of the class.

127.     Any compensatory damages sought by the class are incidental to the injunctive relief and thus certification as a Rule 23(b)(2) class is appropriate.

### COUNT I
### VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e-2(a)(1)
### INDIVDIUAL AND PATTERN AND PRACTICE CLAIMS OF
### WAGE DISCRIMINATION AND RETALIATION

128.     Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

129.     Plaintiff suffered a continuing practice of pay discrimination when KSU paid Plaintiff less than her male counterparts.

130.     Plaintiff voiced her concerns regarding unequal pay to her supervisors.

131.     As a result of her complaint, Defendant retaliated against Plaintiff by refusing to repair the pay discrimination and effectively and continually altering plaintiff's working conditions with each discriminatory paycheck.

132.     As a result of the refusal to repair ongoing discrimination, it was both reasonable for Kathleen Wiler to resign her employment and recover future lost wages via a claim for constructive discharge.

133. KSU knew or should have known that the failure of KSU to end the pay discrimination would result in a reasonable person's resignation and constructive discharge.

134. Plaintiff has preserved her claims (and that of the putative class) and seeks to recover for pay discrimination on a continuing basis from 2010 to the present.

135. As a proximate result of Defendant's actions, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

136. Plaintiff requests the relief set forth in Count V.

## COUNT II
## VIOLATION OF THE EQUAL PAY ACT (EPA), 29 U.S.C. § 206(d)(1)
## UNEQUAL PAY FOR EQUAL WORK

137. Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

138. The EPA prohibits employers from paying employees differently based on the gender of the employees.

139. Plaintiff's job duties as a head coach of field hockey required equal or substantially similar skill, effort, and responsibility as those of her male counterparts.

140. Wiler's job as Head Coach of women's Field Hockey is substantially equal to the jobs of male head coaches. 29 C.F.R. § 1620.13(a)

141. Plaintiff seeks to represent those women employed as coaches, administrators and academics who also are paid comparatively less than their male counterparts.

142. Plaintiff, and the putative class she seeks to represent, suffered an adverse employment action when Defendant failed to pay her equally to her male counterparts working in head coach positions.

143. Plaintiff voiced her concerns regarding unequal pay to her supervisors in December 2017.

144.    As a result of her complaint, Defendant retaliated against Plaintiff by refusing to repair the pay discrimination and effectively and continually altering plaintiff's working conditions with each discriminatory paycheck.

145.    As a result of the refusal to repair ongoing discrimination, it was both reasonable for Kathleen Wiler to resign her employment and recover future lost wages via a claim for constructive discharge.

146.    KSU knew or should have known that the failure of KSU to end the pay discrimination would result in a reasonable person's resignation and constructive discharge.

147.    As a proximate cause of Defendant's actions, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, physical harm, lost wages and benefits, and lost earning capacity.

148.    Plaintiff requests equitable relief set forth below in Count V.

**WHEREFORE,** Plaintiff demands judgment against Defendants in an amount that will fairly compensate her for lost wages, front pay and future wages, emotional distress, court costs, with interest as provided by law, and such other relief as the Court deems appropriate.

### COUNT III
### VIOLATION OF TITLE IX, 20 U.S.C. § 1681
### GENDER DISCRIMINATION IN EDUCATION
### IMPACT OF EQUITY IMBALANCES ON EQUAL WORK AND UNEQUAL PAY

149.    Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

150.    Title IX prohibits policies and practices that prohibits employers from paying employees differently on the basis of gender.

151.    Plaintiff suffered an adverse employment action when Defendant failed to pay her equally to her male counterparts.

152.    KSU has provided and continues to provide unequal support for women's programs and or has not achieved full equality for men's and women's sports.   As such, KSU cannot rest pay

decisions based on any factor impacted by a failure to comply with Title IX, either at KSU or by relying on factors that exist at other universities also not in full compliance with Title IX.

153. Plaintiff voiced her concerns regarding unequal pay to her supervisors.

154. As a result of her complaint, Defendant retaliated against Plaintiff by refusing to repair the pay discrimination and effectively and continually altering plaintiff's working conditions with each discriminatory paycheck.

155. As a result of the refusal to repair ongoing discrimination, it was both reasonable for Kathleen Wiler to resign her employment and recover future lost wages via a claim for constructive discharge.

156. KSU knew or should have known that the failure of KSU to end the pay discrimination would result in a reasonable person's resignation and constructive discharge.

157. As a proximate cause of Defendant's actions, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, physical harm, lost wages and benefits, and lost earning capacity.

158. Defendant's actions were willful and warrant the imposition of punitive damages.

159. Plaintiff requests equitable relief set forth in Count V.

**WHEREFORE,** Plaintiff demands judgment against Defendants in an amount that will fairly compensate her for lost wages, front pay and future wages, emotional distress, court costs, with interest as provided by law, and such other relief as the Court deems appropriate.

## COUNT IV
## DISPARATE IMPACT BASED ON SPECIFIC POLICIES IN VIOLATION OF THE TITLE VII, EQUAL PAY ACT AND TITLE IX

160. Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

161. Title VII, the EPA and Title IX prohibit policies and practices that prohibits employers from paying employees differently on the basis of gender and permit claims for disparate impact on

women that result from the impact of such policies.

162.    KSU's pay policies and practices have the effect of disproportionately reducing the pay of females relative to male working on the roles of coach, administrator or academic.

163.    The statistical analysis done on equal pay for women has consistently shown that women, like Kathleen Wiler, have been disproportionately affected by gender stereotypes and various commonly used practices in college and universities and at KSU.

164.    KSU's use of specific policies include the following:

165.    Reliance on the "Market."  The practice of relying on any individual or policy-driven reliance on alleged market rates.

166.    Retention/Outside Job Offer:  The practice of requiring employees to justify pay raises because they obtained an external offer of employment.

167.    Prior Salary History: The practice of considering prior salary in setting internal salaries for academics (or coaches or administrators) who arrive from another institution.

168.    Failure to Address Implicit Bias:  The practice of ignoring college policies drafted to proactively address the role of implicit bias affecting hiring, promotion, and pay decisions and in the internal assessment of the need for, or application of, the practices listed above.

169.     No substantive link exists between the use of specific policies at KSU and the value added to the university by retention of the employee.

170.    KSU has never performed any study or analysis to show that the practices listed or any other specific practice relied upon to provide higher pay at the moment of hire, raises, contract increases or bonuses are job-related or provide any substantive and necessary benefit to  KSU.

171.    KSU's reliance on these specific practices is also not a business necessity because KSU could have implemented less discriminatory alternative employment practices that served its legitimate goals as effectively.

172.    Kathleen Wiler seek to represent a putative class of female employees adversely affected by KSU's reliance on the specific practices identified above and/or that are similar in nature and commonly used by universities to justify pay increases.

173.    The putative class seeks damages for pay imbalances, including back pay and front pay adjustments and other equitable relief requested in Count V below.

**WHEREFORE,** Plaintiff demands judgment against Defendants in an amount that will fairly compensate her for lost wages, front pay and future wages, emotional distress, court costs, with interest as provided by law, and such other relief as the Court deems appropriate..

## COUNT V
## EQUITABLE RELIEF AFFORDED BY TITLE VII, EPA AND TITLE IX

**WHEREFORE**, Plaintiff re-alleges all previous paragraphs as if fully set forth herein and respectfully requests the Court grant the following relief:

A.  Grant equitable relief in the form of orders requiring Defendant to:

    i.    Refrain from engaging in any employment practice that discriminates on the basis of gender or that permits gender bias and stereotyping to affect pay decisions;

    ii.   Provide training to its supervisory employees regarding how to effectively avoid engaging in gender discriminatory practices and to report to the Court every six months for a period of 3 years on the training provided and its effectiveness;

    iii.  Test and evaluate supervisory employees to assure they do not exhibit or act upon biased attitudes and opinions regarding females, do not tolerate disparate treatment based on gender by their subordinates, and report annually to the court for a period of 3 years on its testing and evaluation.

    iv.   Implement a de-biasing approach to assess all pay decisions for female in each sub-class currently employed at KSU.

B.  In addition to the equitable remedies afforded through Title VII and the EPA, Title IX offers additional remedies via § 106.3 Remedial and affirmative action and self-evaluation.

    i.    (a) Remedial action. If the Assistant Secretary finds that a recipient has discriminated against persons on the basis of sex in an education program or

activity, such recipient shall take such remedial action as the Assistant Secretary deems necessary to overcome the effects of such discrimination.

ii.  (b) Affirmative action. In the absence of a finding of discrimination on the basis of sex in an education program or activity, a recipient may take affirmative action to overcome the effects of conditions which resulted in limited participation therein by persons of a particular sex. Nothing herein shall be interpreted to alter any affirmative action obligations which a recipient may have under Executive Order 11246.

iii.  (c) Self-evaluation. Each recipient education institution shall, within one year of the effective date of this part:

iv.  (1) Evaluate, in terms of the requirements of this part, its current policies and practices and the effects thereof concerning admission of students, treatment of students, and employment of both academic and non-academic personnel working in connection with the recipient's education program or activity;

v.  (2) Modify any of these policies and practices which do not or may not meet the requirements of this part; and (3) Take appropriate remedial steps to eliminate the effects of any discrimination which resulted or may have resulted from adherence to these policies and practices.

vi.  (d) Availability of self-evaluation and related materials. Recipients shall maintain on file for at least three years following completion of the evaluation required under paragraph (c) of this section, and shall provide  to the Assistant Secretary upon request, a description of any modifications made pursuant to paragraph (c)(ii) of this section and of any remedial steps taken pursuant to paragraph (c)(iii) of this section.

C.  Award plaintiff her lost earnings and the value of her lost benefits;

D.  Order Defendant to make Plaintiff whole by providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life;

E.  Order Defendant to make the putative class whole by awarding back pay as permitted by law and making front-pay adjustments to remove the continuing effects of discrimination.

F.  Award Plaintiff her reasonable attorneys' fees and costs;

G.  Award pre-judgment interest, against Defendant, as allowed by law; and

H.  Grant such further relief as the Court deems necessary and proper.

**JURY DEMAND**

**COMES NOW** the Plaintiff, Kathleen Wiler, and hereby requests a trial by jury for all issues triable to a jury in the above-captioned matter.

NEWKIRK ZWAGERMAN, P.L.C.

_/s/ Thomas Newkirk_
Thomas Newkirk AT0005791
tnewkirk@newkirklaw.com
Beatriz Mate-Kodjo AT0012331
Bmate-kodjo@newkirklaw.com
521 E. Locust Street, Suite 300
Des Moines, IA  50309
Telephone:  515-883-2000
Fax:  515-883-2004

and

_/s/ Karen Lefton_
Karen C. Lefton (0024522)
The Lefton Group, LLC
3480 West Market Street, Suite 304
Akron, Ohio 44333
karen@theleftongroup.com
Telephone: 330-864-2003

**ATTORNEYS FOR PLAINTIFF**