**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KATHLEEN WILER, | |
| Plaintiff, | Case No: 5:20-CV-00490<br>Judge Benita Y. Pearson |
| vs. | |
| KENT STATE UNIVERSITY, | **AMENDED<br>COMPLAINT AND JURY DEMAND** |
| Defendant. | |

**COMES NOW** the Plaintiff, Kathleen Wiler, by and through her attorneys, Newkirk Zwagerman, P.L.C. and Caryn Groedel & Associates Co., LPA, and for her cause of action hereby states the following:

## INTRODUCTION

1.     Kathleen Wiler is a highly successful field hockey coach, having helmed Defendant's NCAA Division I women's field hockey team for 13 years (2006–2019).

2.     In that time, Coach Wiler became Defendant Kent State University's ("KSU") winningest field hockey coach, who: holds program records for both Mid-American Conference ("MAC") regular season titles (8 titles) and MAC tournament titles (5 titles); is a 5-time MAC Coach of the Year honoree; coached 56 All-MAC selections (including 6 All-Americans, 25 All-Region selections, 3 MAC Players of the Year, and 5 MAC Newcomers of the Year); and led her team to 5 NCAA tournament appearances.

3.     Coach Wiler was consistently amongst the most successful coaches at KSU in guiding her teams to both athletic and academic success, despite which she was consistently paid less than male coaches, even those who were far less successful.

1

Ex. 1, Pg. 1

4.      Coach Wiler repeatedly reported the pay inequity between her and her similarly situated male counterparts—first to her Athletic Director, and then to the Equal Employment Opportunity Commission—hoping that said reports  would result in KSU investigating its pay scheme and remedy the inequity.

5.      Instead, KSU dismissed Coach Wiler's reports and failed to conduct an investigation into her complaints.

6.      Rather, shortly after Coach Wiler first expressed concern about the gender-related pay disparity, KSU told her that the Athletic Department budget would not allow any coaches to receive a significant pay increase, even though it provided a $20,000 increase to a similarly situated male coach.

7.      Ultimately, the repeated acts of gender-based salary discrimination made it unbearable for Coach Wiler to continue working for KSU, which resulted in her resigning in a constructive discharge.

8.      Coach Wiler now brings this employment discrimination action against KSU to seek redress of KSU's violation of her rights under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. §2000e *et. seq.* ("Title VII"); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.* ("Title IX"); and the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), all of which prohibit gender and wage discrimination.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343.

10.     This Court has jurisdiction to provide declaratory and other relief pursuant to

**Ex. 1, Pg. 2**

28 U.S.C. §§ 2201, 2202.

11.     Venue is proper in the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C. § 1391(b) because the events forming the basis of Plaintiff's claims occurred in Kent, Ohio, which is within the jurisdiction of this Court.

12.     Plaintiff has exhausted her administrative remedies by timely filing a charge of discrimination with the EEOC and requesting and receiving a Right to Sue letter.

## THE PARTIES

13.     At all material times, Coach Wiler was a citizen of Ohio and an "employee" of KSU as defined by Title VII and the EPA.

14.     KSU, a public research university, is an educational institution receiving federal financial assistance from, and organized under the laws of, the state of Ohio.

15.     As a public entity, KSU is subject to public records laws and Freedom of Information Act (FOIA) requests, and its employees' compensation is public record.

16.     Many of the documents, and much of the extrapolated data, contained or referenced in Wiler's EEOC Charges and this Complaint, were provided by KSU pursuant to FOIA requests made by Coach Wiler's prior counsel.

17.     The U.S. Department of Education requires KSU to report data about its intercollegiate athletic programs pursuant to the Equity in Athletics Disclosure Act ("EADA"). *See generally* https://www2.ed.gov/finaid/prof/resources/athletics/eada.html.

18.     The U.S. Department of Education maintains a website with university-provided data that is easily accessible to the public and available at https://ope.ed.gov/athletics/#/,[1] which is

---

[1] To find KSU's publicly available data, visit https://ope.ed.gov/athletics/#/, click on the "download custom data" feature, search "Kent State University at Kent, select "all years", scroll to the bottom of the screen and select "all data combined", and select "download" to populate a

**Ex. 1, Pg. 3**

the source of additional raw or extrapolated date referenced in this Complaint.

19.  KSU must certify the EADA data it provides to the U.S. Department of Education in order to continue receiving federal funds. See 34 C.F.R. § 668.14(c)(2)(ii); 34 C.F.R. § 668.41(g) and 34 C.F.R. § 668.47(c).

20.  KSU certifies data including, but not limited to, student body enrollment numbers by gender, student athlete participation numbers by gender, athletic program operating expenses, athletic program revenues, coaching staff salaries, and the gender of coaches for each men's and women's athletic team.  See 34 C.F.R. § 668.47.

21.  KSU's employment policy prohibits unlawful discrimination in employment and is publicly available at https://www.kent.edu/policyreg/university-policy-regarding-unlawful-discrimination-and-harassment.

22.  Specifically, KSU's university policy states that it is the policy of the university to:

 i.  Apply the federal and state definitions of unlawful discrimination and harassment in implementing this policy.

 ii.  Communicate that unlawful discrimination and harassment are unacceptable and will not be tolerated.

 iii.  Educate the university community regarding individual rights with regard to unlawful discrimination and harassment.

 iv.  Investigate alleged incidents that are reported in an appropriate and timely manner.

23.  KSU's university policy ensures at least as much protection from employment discrimination as do the federal civil rights laws, which prohibit gender discrimination and gender-based wage disparities.

## HISTORICAL CONTEXT AND STATUTORY SCHEMES

---

complete, searchable Microsoft Excel spreadsheet.

Ex. 1, Pg. 4

24.     Title VII forbids gender-based discrimination "with respect to compensation" and makes it an unlawful practice for an employer "to limit, segregate, or classify . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [their] status as an employee."  42 U.S.C. § 2000e2(a)(1)–(2).

25.     The EPA prohibits employers from paying employees at a rate less than employees of the opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

26.     Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. 1681.

27.     Title IX requires equitable compensation of coaches employed by federally funded educational institutions, such as KSU.[2]

28.     Now, more than half a century after the passage of these laws, women still earn less than men, even after controlling for factors such as education and experience,[3] and women are still woefully underrepresented in high-level, executive, and/or leadership roles.

29.     Institutions of higher learning are not immune from gender-based pay discrimination across the country, where women continue to be greatly underrepresented and

---

[2] *See* 34 C.F.R. §§ 106.51–.61 (subpart E interpreting Title IX to cover and protect employees of educational institutions); *N. Haven Bd. of Ed. V. Bell*, 456 U.S. 512, 512 (1982) (determining that "subpart E regulations promulgated in connection with Title IX are valid").

[3] *Fifty Years After the Equal Pay Act: Assessing the Past, Taking Stock of the Future*, National Equal Pay Task Force, p. 6 (June 2013) *available at*: https://obamawhitehouse.archives.gov/sites/default/files/equalpay/equal_pay_task_force_progress_report_june_2013_new.pdf.

**Ex. 1, Pg. 5**

underpaid.[4]

30.     As of 2012, approximately 86% of all university presidents, provosts, and chancellors were male, and 74% of professors were male.[5]

31.     Female professors have heavier workloads, lower salaries, and move up the career ladder slower than male professors.[6]

32.     The disparities are similarly glaring in college athletic departments.

33.     Nationally, only 43.4% of head coaching jobs of women's team are held by women; 98% of head coaching jobs of men's teams are held by men; and 77.7% of all college and university athletic directors are male.[7]

34.     Title VII and the EPA both address the various ways in which women continue to receive lower wages than men, while performing the same amount of work, and often more, than their male peers.

35.     Title IX expressly recognizes what Title VII and the EPA imply:  that pre-existing structural differences create barriers to women earning wages equal to that of their male peers.

36.     For example, Title IX recognizes that women, as a group, hold lower-paying positions because there are fewer employment opportunities for them in certain educational sectors.

37.     For instance, women are almost never hired to coach men's programs, but men are

---

[4] Bischel, J. & McChesney, J., *The Gender Pay Gap and the Representation of Women in Higher Education Administrative Positions: The Century So Far*, CUPA-HR, p. 12 (February 2017) *available at*  http://www.cupahr.org/surveys/files/briefs/cupahr_research_brief_1.pdf.

[5] Parker, P., *The Historical Role of Omen in Higher Education*, Administrative Issues Journal: Connecting Education, Practice, and Research (Spring 2015), Vol. 5, No. 1: p. 9.

[6] *Id.*

[7] Acosta, V. & Carpenter, J., *Women in Intercollegiate Sport: A Longitudinal Study Thirty-Seven Year Update A-C* (2014), *available at* www.acostacarpenter.org.

**Ex. 1, Pg. 6**

regularly hired to coach women's programs.

38.     In other words, men are considered hirable for all coaching positions, while women are considered hirable only for approximately half of coaching positions (those on *women's teams*).

39.     The same is true for female academics in, e.g., STEM programs, where women have historically been, and continue to be, significantly underrepresented.

### STRUCTURAL CHALLENGES TO OVERCOMING THE GENDER WAGE GAP

40.     Women, including Coach Wiler, are also often paid less than their similarly situated male counterparts because they are subjected to the effects of gender stereotypes that devalue women's pay at the time of hire, during consideration of raises/contract extensions, and in the evaluation of work performed and success obtained.

41.     As expert testimony will confirm, the sources of these gender stereotypes are:

    a.  Leadership / lack of fit / role incongruity bias:  Leadership roles—e.g., head coach, executive, or university administrator—are still viewed as male-type roles.  As a result, the work of men performing in leadership roles is valued more than the work of women performing in these roles.

    b.  Family care over bias: Stereotypes persist that a woman's expected and/or preferred role is to care for her family first, and her career second.  The opposite is expected of men.  Work performed by women who pursue their career over family will be devalued due to stereotypes that they should either not be pursuing career or family (because that is not their expected role), or that they will eventually abandon their career to prioritize family.  This results in wage disparities.

    c.  Service work / support bias:  Women are expected to perform, and still do perform, much of the non-paid or underpaid work in the home and workplace (e.g., childcare, household tasks, low-level administrative tasks, and service-type tasks).  These stereotypes result in women in leadership roles being required to perform these service-type tasks at a level that would normally be expected of those in leadership positions. For instance, a female in academia may be expected to work more directly with students or carry a heavier teaching load than her male peers. Female coaches are often expected to spend more time nurturing/managing the emotional needs of their athletes.  Many universities

expect women to do this work *in addition to* their normal job duties, yet they often do not provide female coaches with the necessary support (administrative help or resources), or increase in wages, despite performing these additional tasks.

    d.   <u>Negotiation bias / backlash</u>: Stereotypes suggest males are expected to take affirmative steps to seek career advancement and salary increases.  The opposite is expected of women.  In fact, the requests of women who ask for promotions or raises are not only often denied, but these women are often subjected to backlash for having asked.

42.    In addition to stereotypes, many universities, including KSU, rely on policies and practices that perpetuate structural pay inequalities, the five most common being:

    a.   <u>Reliance on the "market" and/or revenue production</u>:  The practice of relying on alleged market rates—what the market feels a coach is worth—or the practice of relying on expected or claimed revenue production;

    b.   <u>Retention / Outside job offers</u>: The practice of permitting or requiring employees to justify salary increases  by showing they have sought or obtained an external job offer , at which time the current employer must increase pay to retain the employee;

    c.   <u>Prior salary history</u>:  The practice of considering prior salary in setting internal salaries at the time of hire and during contract negotiations;

    d.   <u>Reliance on invalid or subjective rationales</u>: The practice of not creating standards to evaluate salaries, and/or the practice of utilizing subjective reasons to increase, or deny an increase, in wages.

    e.   <u>Failure to address stereotypes and implicit bias</u>: The practice of failing to proactively address the role that gender stereotypes, gendered socialization, and implicit bias play in salary decisions; and the practice of failing to address the effect of such biases in assessing the need for, or application of, the practices listed in (a)–(d).

43.    While other specific practices may exist, these five practices most often have the most significant adverse impact on women working in generally male dominated leadership roles, such as head coach.

44.    These practices provide an enormous advantage for males at the expense of their female colleagues, such as:

    a.   Men have almost exclusive access to the jobs (e.g., head coach of men's teams) that have long been valued most highly, which positively impacts a man's salary, perceptions of his market value, his ability to earn revenue in his sport (because those sports are more likely to generate revenue) and which creates access to higher wages for male coaches compared to female coaches, regardless of whether their work, effort, and responsibility are equal.

    b.   Men are more comfortable than women seeking outside job offers and negotiating salary because (1) men and women are socialized differently in regard to the traits/behaviors that lead one to seek outside job offers or request salary increases, and (2) men often benefit from these efforts; i.e., they often receive the salary increase, while women suffer backlash.

    c.   Men are not at the same risk level of negative gender stereotypes as women, which reduce women's chances of obtaining a job offer, or reduce the salary they are offered.

45.    EEOC guidance recognizes that advantages based on gender stereotypes, or that exist due to gender-based socialization differences—unless job- related and scientifically validated —cannot be "a factor other than sex."

## STRUCTURAL INEQUALITY WITHIN KSU

46.    In line with the general challenges described above, women in KSU's Athletic Department are systemically underrepresented, undervalued, and underpaid.

47.    In KSU's Athletic Department, women hold 49 positions (38%), but only 6 (12%) are in the top 1/3 of pay, and they are disproportionally stuck at the bottom of the scale, with 18 (37%) landing the middle third, and 25 (51%) landing in the bottom third.

48.    KSU also systemically engages in sex-based segregation within athletics, which harms female athletes.[8]

---

[8] "Imposing sex segregation on sports is problematic for many reasons. Sex segregation reflects and reinforces a binary view of both sex and gender unsupported by science. It communicates that women are physically unable to compete against men, even though research indicates considerable variation among individual athletes and different sports, and further reveals that attributes other than sex are often more important determinants of athletic ability. It reinforces unfounded gender stereotypes that harm both women and men. And sex segregation uncritically

9

*49.*    Currently, no women coach men's teams, *and only three of KSU's 10 women's teams are coached by women.*

50.    Since 2006, when Wiler was hired, there have been 26 head coaches of the various sports KSU offers, only 5 of whom have been women.  No woman has coached a men's team, but men have coached most of the women's teams.

51.    When a male coach leaves KSU, he has typically been replaced by a male coach, but when a female coach leaves, she is most often replaced by a male.[9]

52.    According KSU's EADA data, the average KSU male coach's salary in 2018 was $256,000, compared to $96,000 for female coaches.

53.    Historically, KSU has paid head coaches of men's teams—all of whom have been men—significantly more than coaches of women's teams, and the pay disparity has dramatically *increased* over time.

54.    The data below, taken from KSU's EADA data, shows the average salaries paid to full-time head coaches and assistant coaches of men's and women's teams from 2006 to 2018.

---

prioritizes athletic activities involving strengths typically associated with male bodies, without requiring us to ask why we view these strengths as the most important in the first place." Leong, *Against Women's Sports*, Washington University Law Review, Vol 95:1 (2018).

[9] For example, when Mora Kanim left in 2006 after 10 years as women's volleyball coach, she was replaced by Glen Conley; when Conley left in 2012, he was replaced by another man, current coach Don Gromala. When KSU decided in 2012 not to rehire longtime women's basketball coach Robert Lindsay, it broke with tradition by hiring Danielle O'Banion in his place, but when she left four years later, the school reverted to form and replaced her with a man, current coach Todd Starkey. When longtime women's golf coach Mike Morrow left in 2013, he was replaced by Greg Robertson. When longtime softball coach Karen Linder resigned in 2015, she was replaced by a man, current coach Eric Oakley.

**Ex. 1, Pg. 10**

| Year | Men's Team Head Coaches | Women's Team Head Coaches |
|------|------------------------|---------------------------|
| 2006 | $121,199 | $73,912 |
| 2007 | $138,482 | $186,249 |
| 2008 | $122,803 | $90,820 |
| 2009 | $133,610 | $87,199 |
| 2010 | $184,609 | $92,079 |
| 2011 | $193,019 | $98,365 |
| 2012 | $208,346 | $84,090 |
| 2013 | $201,998 | $92,136 |
| 2014 | $228,993 | $93,166 |
| 2015 | $225,401 | $88,784 |
| 2016 | $244,517 | $110,075 |
| 2017 | $289,730 | $103,315 |
| 2018 | $254,747 | $97,765 |

| Year | Men's Team Assistant Coaches | Women's Team Assistant Coaches |
|------|------------------------------|--------------------------------|
| 2006 | $47,005 | $34,105 |
| 2007 | $52,324 | $34,205 |
| 2008 | $42,178 | $36,870 |
| 2009 | $49,218 | $34,818 |
| 2010 | $62,615 | $36,821 |
| 2011 | $60,016 | $47,083 |
| 2012 | $68,516 | $40,687 |
| 2013 | $66,763 | $37,928 |
| 2014 | $68,942 | $40,421 |
| 2015 | $68,519 | $36,889 |
| 2016 | $77,509 | $43,925 |
| 2017 | $71,822 | $44,110 |
| 2018 | $78,228 | $42,813 |

55. This is strong evidence that KSU places far more value on men's athletics than women's athletics, even though none of KSU's sports teams, men's or women's, generate net revenue for the university.

56. KSU's systemic undervaluing of women's athletics is also evidenced by its extreme noncompliance with Title IX's requirements of equitable athletic opportunities and funding for women's sports.

57. For example, per KSU's 2016 EADA report, there was a 13.74 participation gap, meaning that, in order to maintain the number of male athletes at KSU in 2016—and remain compliant with the first prong of Title IX's participation test—KSU would have had to add 187 meaningful athletic participation opportunities for women.

58. To put this in perspective, KSU had 250 female athletes in 2016, but had it been complaint with Title IX, it would have had 437.

59. This extreme participation gap also results in a significant loss of scholarship opportunities for female students.

60. According to the 2018 EADA data, 62.2% of KSU undergraduate students were

11

women, yet male athletes received nearly $1 million more in scholarship funds than female athletes.

61.     Specifically, approximately $4 million in scholarships were given to male athletes, compared to approximately $3 million to female athletes.

62.     Given KSU's systemic undervaluing of women's sports, and underrepresentation of women in the athletic department, it is no surprise that Coach Wiler was paid less than her male comparators due to her gender.

<b><u>KSU Underpaid Coach Wiler Due to Her Gender</u></b>

**<u>Background</u>**

63.     Field hockey has defined Coach Wiler's professional life, having played field hockey throughout her youth, which helped her develop key life skills, including leadership, a strong work ethic, and a standard of excellence she honed throughout her professional career, which culminated in her position as Head Coach at KSU.

64.     Wiler played National Collegiate Athletic Association (NCAA) Division I field hockey in the Big East Conference at Providence College, Rhode Island, and following her graduation, served as KSU's Graduate Assistant coach while obtaining her Master's degree in Education at KSU.

65.     Wiler worked as an Assistant Field Hockey Coach at Miami University from 2002 to 2005, coached the national USA–Canada Challenge Cup during the summers of 2005 and 2006, and in 2006, under her coaching, the U.S. under-21 team went 4–0 to win the Can-Am Cup.

**<u>Coach Wiler's Employment at KSU</u>**

66.     In February 2006, when KSU hired Wiler to be the Head Coach of its women's Field Hockey Team, she and KSU entered into a 2-year contract, with KSU paying her an initial

base salary of $55,000.

67.     Throughout her head coaching career, KSU's Women's Field Hockey team was a NCAA Division I program that participated in the NCAA Mid-American Conference (the "MAC").

68.     Coach Wiler wasted no time in turning KSU into a field hockey powerhouse, leading the 2008 team to both MAC regular season and Tournament titles, and posting the program's best record since 2000.

69.     In 2008, Coach Wiler and KSU entered into a 4-year contract, with KSU paying Wiler an annual base salary of $60,000.

70.     In the winter of 2008, Wiler earned Level II (High Level Development) coaching certification from USA Field Hockey, and she was one of 25 coaches selected to attend the NCAA Women Coaches Academy.

71.     In September 2011, Coach Wiler and KSU entered into another 4-year contract, with KSU paying Wiler an initial base salary of $65,000.

72.     Throughout that contract period, Coach Wiler's team continued to excel.

73.     Coach Wiler first began negotiations for her contract renewal in approximately January 2016, when she submitted her written proposal to Athletic Director ("AD") Joel Nielson.

74.     The field hockey team had just finished another successful season, winning its third-consecutive MAC regular season championship, third-consecutive MAC Tournament Championship, and making its third-consecutive NCAA tournament appearance.

75.     At the time, Coach Wiler was *the only* female head coach at KSU, and the lowest paid of all coaches.

76.     Given her undeniable success as coach, including in comparison to most of her male

peers, Wiler asked for her base salary be increased to $80,000—the approximate average for head coaches of Olympic sports—which would have placed her on par with other field hockey coaches in the MAC who had won championships, although all won fewer championships than Wiler.

77.     Coach Wiler heard nothing from AD Nielson regarding her proposal until March 2011, when he presented her with an offer far below that which she had proposed.

78.     From approximately March through July 2011, Coach Wiler repeatedly informed AD Nielson that she believed KSU was paying her a lower salary than the male coaches based on her gender.

79.     Rather than investigate Coach Wiler's statement, AD Nielson dismissed it by providing her with his opinion on why he did not *believe* there was such a pay discrepancy.

80.     AD Nielson further told Wiler that he was unable to give her the raise she requested because there were insufficient funds in the budget, and that no coaches negotiating their contracts that year would be receiving large raises.

81.     This was untrue, as women's volleyball coach Don Gromala received a $20,000 salary increase after having been employed by KSU for only 3 seasons, less than Wiler's *five-year tenure* at that time.

82.     AD Nielson also told Coach Wiler that his proposed salary for her was appropriate because it would make her the third highest paid field hockey coach in the MAC—though Coach Wiler was far more successful than the other two higher-paid coaches.

83.     This arbitrary fact was rendered even more absurd by the fact that AD Nielson himself was, *by far,* the highest-paid Athletic Director in the MAC.[10]

---

[10]    Kevin Kleps, *Group of Kent State backers, former staffers urging university to fire director of athletics Joel Nielson*, CRAIN'S CLEVELAND BUSINESS, October 26, 2019, *available at* https://www.crainscleveland.com/kevin-kleps-blog/group-kent-state-backers-former-staffers-

Ex. 1, Pg. 14

84.     Coach Wiler continued trying to negotiate her contract in good faith until July, when she had no choice but to sign the contract because AD Nielson told her to "take it or leave it."

85.     The best Coach Wiler was able to negotiate was a 3-year contract with an initial base salary of $76,500.

86.     Meanwhile, Coach Gromala got a 5-year contract, with an initial base salary of $90,000.

87.     During her tenure at KSU, Wiler became KSU's winningest field hockey coach, and she holds program records for both MAC regular season and tournament titles, winning 8 MAC regular season titles, 5 tournament titles, and 5 NCAA post-season appearances, including 3 consecutive tournament titles from 2014-2016.

88.     In addition to team success, Coach Wiler has had success as a mentor and coach, including being a 5-time MAC Coach of the Year, coaching 6 All-American selections, 25 All-Region selections, 3 MAC Players of the Year, and 5 MAC Newcomers of the Year among her 56 All-MAC selections.

89.     Under Coach Wiler's leadership, the women's field hockey program demonstrated leadership and success in the classroom: at least 9 of Coach Wiler's players were named to the

---

*urging-university-fire-director-athletics*.

Nielsen, according to data compiled by USA Today, made almost $140,000 more than any other MAC director of athletics in 2017-18. That year, the Kent AD had a $436,560 salary and received a deferred $20,000 toward a retirement plan. The $456,560 total was 43% ahead of Northern Illinois director of athletics Sean Frazier, whose $319,999 in earnings ranked second in the conference. The other eight MAC athletic directors made $285,000 or less.

*Id.*

NFHCA's National Academic Squad *each season*.

## HEAD COACHES OF ATHLETIC TEAMS AT KSU ARE SIMILARLY SITUATED & PERFORM SUBSTANTIALLY EQUAL WORK

90.     KSU's working conditions were supposed to be similar for all coaches, regardless of gender, based on the university's non-discrimination in employment policies. *See* https://www.kent.edu/policyreg/university-policy-regarding-unlawful-discrimination-and-harassment.

91.     Title IX mandates that KSU provide equal athletic opportunities to athletic programs, regardless of the gender of the athletes.  See 34 C.F.R. § 106.41, *et seq*.

92.     Title IX regulations specifically define KSU's obligation to provide and maintain equal opportunities for male and female athletic programs.

93.     Title IX mandates that athletic participation opportunities for female student athletes be substantially proportional to the percentage of undergraduate women enrolled in the school.

94.     Accordingly, resources provided to athletic programs are supposed to be substantially proportional along gender lines.

95.     KSU is significantly out of compliance with Title IX's athletic participation requirements, the ripple effect of which has resulted in the underfunding of women's teams, and in particular, the women's teams coached by women.

96.     For much of her tenure at KSU, Wiler was the sole female head coach, and her salary was tied to the resources KSU provided its women's field hockey program, despite the success of the program and KSU's requirement to provide equal athletic opportunities to female student athletes, including those in the field hockey program.

97.     The Code of Federal Regulations defines "Equal opportunity" in intercollegiate

16

athletics as:

> A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
>
> > **(1)** Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> > **(2)** The provision of equipment and supplies;
> > **(3)** Scheduling of games and practice time;
> > **(4)** Travel and per diem allowance;
> > **(5)** Opportunity to receive coaching and academic tutoring;
> > **(6)** Assignment and compensation of coaches and tutors;
> > **(7)** Provision of locker rooms, practice and competitive facilities;
> > **(8)** Provision of medical and training facilities and services;
> > **(9)** Provision of housing and dining facilities and services;
> > **(10)** Publicity.

See 34 C.F.R. § 106.41(c).

98.     The job duties of KSU head coaches are inherent to ensuring KSU's mandate to provide equal athletic opportunities for its male and female student athletes. ensure

99.     It is KSU's head coaches' responsibility to guarantee equal athletic opportunities to male and female students, including but not limited to actively recruiting athletes to ensure program competitiveness, procuring equipment, managing program resources, administering the budget, and *coaching*.  See 34 C.F.R. § 106.41(c).

100.    Universities compensate head coaches, in part, to ensure competitiveness of athletic programs.

101.    Head Coaches of the various athletic programs at KSU perform job duties that require substantially similar skill, effort, and responsibilities, including but not limited to teaching/training, counseling/advising, general program management, budget management, fundraising, public relations, and recruiting.

17

102.    As the Field Hockey Head Coach, Wiler was similarly situated to the head coaches of other athletic programs at KSU.

103.    For example, Coach Wiler and volleyball Coach Gromala both supervised 2 assistants.

104.    According to EADA data between 2006 and 2018, Wiler and Gromala coached a similar number of athletes—between 18 and 26 for Wiler, and between 12 and 19 for Gromala.

105.    Because Wiler coached, on average, more athletes than Gromala between 2006 and 2018, she spent more time on individual instruction, counseling, and mentoring than Gromala.

106.    According to 2018 EADA data, field hockey generated more revenue than volleyball—approximately $808,000 for field hockey, and approximately $757,000 for volleyball—but since neither generated net revenue, their importance in the Athletic Department should have been similar.

107.    According to 2015–2017 EADA reports, other than football and men's and women's basketball, Coach Wiler's team was consistently in the top revenue tier.

| 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|
| Baseball | $1,076,319 | Baseball | $1,162,108 | Baseball | $1,249,986 |
| W Track[11] | $859,572 | Softball | $866,178 | Field Hockey | $879,199 |
| Softball | $850,824 | W Soccer | $856,580 | W  Soccer | $878,077 |
| Field Hockey | $797,578 | Field Hockey | $854,678 | Softball | $833,406 |
| W Soccer | $790,361 | W Track | $800,868 | W Track | $778,981 |
| W Volleyball | $684,099 | W Volleyball | $772,228 | W Volleyball | $753,226 |
| M Track | $635,848 | W Gymnastics | $645,855 | W Gymnastics | $653,923 |
| W Gymnastics | $609,169 | Wrestling | $641,998 | Wrestling | $641,859 |
| Wrestling | $592,958 | M Track | $597,109 | M Track | $615,960 |
| M Golf | $558,291 | M Golf | $594,327 | M Golf | $605,475 |
| W Golf | $475,467 | W Golf | $496,126 | W Golf | $466,466 |

108.    Both Wiler and Gromala were responsible for managing their team's public

---

[11] For EADA reporting purposes, "Track" includes both Track and Field and Cross Country.

Ex. 1, Pg. 18

relations and marketing, though volleyball received far more institutional support from KSU, such as reaching out to alumni; thus, Wiler and her staff had to spend more time on marketing and promotion, such as community outreach and social media, than Gromala and his staff.

109.    Both teams were required to fundraise, but since KSU provided more institutional support to volleyball than field hockey, Wiler and her staff had to spend more time fundraising than Gromala and his staff.

110.    Coach Wiler also spent significantly more time than any male coach attending to the emotional needs of, and having one-on-one meetings with, her athletes.

111.    Coach Wiler, like all coaches at KSU,  worked long hours and was essentially on call 24/7.

112.    The primary duties of Coaches Wiler and Gromala, like all coaches at KSU, was to instruct their athletes in the skills of their respective sports, manage team competition, fundraise, travel, and recruit.

113.    The time KSU coaches spend on these duties is essentially the same among all sports, varying only based on whether the sport is in-season or off-season.

114.    In sum, excluding the specific sports skills taught, Wiler's job was essentially the same as Gromala's, except that Wiler did *more* work due to having to spend more time than Gromala on publicity, public relations, marketing, fundraising, and athlete counseling, yet KSU paid  Gromala significantly more than Wiler.

115.    KSU hired Gromala in 2012, at which time his base salary was nearly identical to Wiler's, despite the fact that he had no head coaching experiencing, while Wiler had 11 years of coaching experience at that time, and despite the fact that Wiler had already been a coach at KSU for 6 years.

19

**Ex. 1, Pg. 19**

116.    While Coach Wiler was raising concerns KSU's gender-based disparate treatment in terms of salary, Gromala received a $20,000 salary increase, resulting in his salary surpassing that of Wiler by approximately $12,000, and the gap increased with their respective annual increases in base salary, despite Gromala having less coaching experience than, and no comparable history of successes as, Wiler.

117.    Overall, Wiler's skill, effort, responsibility, and quality of work as a coach was substantially similar and equal to the skill, effort, responsibility, and quality of work as KSU's male head coaches.

118.    For example, in 2016, Coach Wiler was one of KSU's five MAC Coaches of the Year, along with Jeff Duncan (baseball), Herb Page (golf), Roberto Marinaro (women's soccer), and Eric Oakley (softball), when

a.    Duncan's base pay was $186,498, totaling $195,054 with additional compensation.

b.    Page's base pay was $175,031, totaling $191,587 with additional compensation.

c.    Marinaro's base pay was $75,884, totaling $96,240 with additional compensation.

d.    Oakley's base pay was $68,357, totaling $99,396 with additional compensation.

e.    Compared to Wiler's 2016 base pay of $74,465, totaling $85,496 with additional compensation, the average compensation of the male coaches, whose similar skill, effort, and responsibility resulted in them all receiving the MAC Coach of Year Award, was $145,436—$60,000 more per year than Wiler.

f.    The average pay of the male coaches who did not receive MAC Coach of the Year Awards (excluding football and excluding cross-country), was $127,406—almost $42,000 more per year than Wiler.[12]

119.    Coach Wiler's team was one of six MAC regular season champions; the male coaches with championship teams were Duncan, Page, Greg Robertson (women's golf), Brice

---

[12] Football and cross country were not performing at this high level, so they were excluded from this analysis.

20

Biggin (gymnastics), and Oakley.

    a.   Duncan's base pay was $186,498, totaling $ 195,054 with additional compensation.

    b.   Page's base pay was $175,031, totaling $191,587 with additional compensation.

    c.   Robertson's base pay was $83,786, totaling $99,192 with additional compensation.

    d.   Biggin's base pay was $76,698, totaling $95,554 with additional compensation.

    e.   Oakley's base pay was $68,357, totaling $99,396 with additional compensation.

120.    Compared to Wiler's 2016 base pay of $74,465, totaling $85,496 with additional compensation, the average compensation of these five male head coaches, whose similar skill, effort, and responsibility resulted in a MAC regular season championship, was $136,028—$50,000 per year more than Wiler.

121.    The average compensation of the male head coaches who did not achieve the regular season championship was $149,565—$64,000 per year more than Wiler.

122.    In 2016, Wiler and one other coach, Marinaro, won the MAC Tournament, at which time Marinaro's base pay was $75,884, totaling $96,240 with additional compensation, compared to Wiler's base pay of $74,465, totaling $85,496 with additional compensation, while the average salary of the male coaches who did *not* win their respective 2016 MAC Tournaments, was $157,143—approximately $71,500 per year more than Wiler.

123.    In 2016, Coach Wiler's team, and those of three male KSU coaches—Page, Robertson and Biggin—participated in NCAA competition, at which time:

    a.   Page's base pay was $175,031, totaling $191,587 with additional compensation.

    b.   Robertson's base pay was $83,786, totaling $99,192 with additional compensation.

    c.   Biggin's base pay was $76,698, totaling $95,554 with additional compensation.

    d.   Wiler's base pay was $74,465, totaling $85,496 with additional compensation,

  e. The average salary of the three male head coaches who participated in the NCAA post-season competition was $128,777.

124. Compared to Wiler's 2016 base pay of $74,465 totaling $85,496 with additional compensation, the average salary of the male head coaches that did not appear in their respective 2016 NCAA Tournaments was $160,455.

125. At that time in 2016, there were 14 head coaches at KSU and only one coach, Page, had as many MAC and NCAA accomplishments as Wiler.

126. At that time, she was in the top two (with Page) in terms of overall success, she was the only female head coach, she was the sixth most senior coach at KSU, and yet, out of 14 head coaches, she was twelfth worst-paid.[13]

127. A review of the KSU male coaches compared to Coach Wiler's accomplishments, shows that Wiler maintained this success.

  a. Wiler was MAC Coach of the Year five times. Only two other coaches topped that: Page with eight, and Lawson (track/cross country) with six.

  b. Wiler's team was the MAC Regular Season Champion eight times. Only two coaches topped that:  Lawson with ten, and Page with nine.

  c. Wiler's team was the MAC Tournament Champion five times, tying with one former baseball coach, Scott Stricklin.

  d. Wiler's team has participated in NCAA competition five times. She is equaled in that by two male coaches: Stricklin and Robertson, who Page topped with ten appearances, Biggin with nine, and Morrow with seven for his women's golf team.

---

[13] KSU gave Mark Croghan the job title of head coach for men's cross country, but he was treated, and paid, per KSU's organizational charts, like an assistant coach.  When he became Facilities Manager, an assistant coach was hired to replace him.  In 2016, softball coach Eric Oakley's base pay was just slightly less than Wiler's, but KSU paid him $31,000 in "additional" pay, which catapulted him from 13th to 9th in earned income for 2016, while  Wiler fell to 13th, even though her team had an outstanding year.

e. Wiler was at or near the top in most of categories of success compared to all coaches, and higher when compared to coaches of sports for which KSU provides the most support and backing -- football, basketball, and baseball -- none of which surpass Wiler's accomplishments and successes.

128. Coach Wiler's average salary has always been substantially lower than the average salary of the males, even when they have similar or far fewer successes than Wiler, given equal skill, effort, and responsibility.

### HEAD COACHES AT KSU PERFORM SUBSTANTIALLY SIMILAR WORK

129. None of KSU's athletic programs is revenue-producing, and all operate at a deficit each year.

130. Even if some male athletic programs generated more revenue for KSU, there is no economic defense to Title IX. See *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) ("Thus, a recipient may not simply plead limited resources to excuse the fact that there are fewer opportunities for girls than for boys.").

131. Wiler's job as Head Coach of women's Field Hockey at KSU was substantially equal to the jobs of male head coaches at KSU. *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1035 (11th Cir. 1985) (affirming district court's holding that the female university intramural sports coach, and male men's basketball coach, had substantially equal jobs.

132. Wiler's job as Head Coach of women's Field Hockey at KSU required equal skill, effort, and responsibility as the other head coach positions at KSU. *Brennan v. Woodbridge School Dist., No. 74- 103*, 1974 WL 1167*3 (D. Del. July 16, 1974) (male coach for high school boys' hardball and female coach for high school girls' softball had substantially equal jobs; "In concluding that the jobs are substantially equal, we do not depend upon the job classification or description but rather upon the actual job requirements which must be viewed over the entire work

cycle.")

133.    Other than variations in the coaching methods used, the skills required to coach student athletes is substantially similar, regardless of the sport or the gender of the student athletes.

134.    KSU required Coach Wiler to expend more effort than male head coaches in teaching/training and counseling/advising her student athletes for gender-stereotypical reasons, yet paid her less that it paid its male head coaches.

135.    KSU required Coach Wiler to expend at least the same amount of effort as male head coaches in programming, budgeting, fundraising, and recruiting.

136.    Coach Wiler had more difficult conditions than male coaches because of the higher expectations KSU placed on her as a female coach of female student athletes, yet provided her less resources and less support than it provided its male coaches of men's sports.

### WILER REPEATEDLY COMPLAINED ABOUT GENDER DISCRIMINATION & UNEQUAL PAY, BUT KSU FAILED TO ACT

137.    Coach Wiler first raised the unequal pay issue in early 2016 while negotiating her contract renewal, at which time she was the only female head coach in KSU's Athletic Department.

138.    AD Nielsen did not escalate or investigate Coach Wiler's unequal pay report.

139.    On January 23 and March 2, 2017, Coach Wiler's previous counsel from Ogletree Deakins' pay equity practice group in San Diego, complained to KSU's then-President Dr. Beverly Warren, AD Joel Nielsen, and KSU Vice President and General Counsel Willis Walker, via e-mail correspondence, which alleged Title VII and Equal Pay Act violations.

140.    In May 2017, Coach Wiler's prior counsel notified Walker that Wiler was being subjected to gender-based disparate treatment in terms of her salary, identified documents in KSU's possession that would support her allegation, and informed KSU's General Counsel that, absent remedial re-negotiation of her contract, she would be filing administrative charges.

141.    On May 11, 2017, instead of re-negotiating Coach Wiler's contract, or otherwise addressing her report of discrimination, KSU's Deputy General Counsel sent Wiler's counsel a retention and litigation hold notice to preserve evidence for litigation.

142.    In August of 2017, Wiler filed her first employment discrimination Charge with the EEOC against KSU, formally and administratively putting KSU on notice of her concerns regarding potential equal pay violations.

143.    KSU failed to take any remedial action in response to Coach Wiler's reports or EEOC Charge.

144.    Although KSU's non-discrimination policy states that KSU will "Investigate alleged [discrimination] incidents that are reported in an appropriate and timely manner[,]",  KSU refused to investigate or remedy Coach Wiler's gender discrimination, wage discrimination, and unequal pay reports.

145.    Instead of taking remedial action or providing Coach Wiler with objective criteria explaining or undermining her pay inequity concerns, KSU made it clear that Wiler's only option was to accept a discriminatory salary or separate from the university.

146.    KSU's retaliatory actions and the continuing, discrete, acts of pay discrimination in the paychecks Wiler received from KSU each month, as well as the other above-described intolerable work conditions and derailing of her career by KSU, left Wiler with no choice but to resign in a constructive discharge on February 28, 2019, as any reasonable female head coach would have done under those circumstances.

147.    KSU discriminated against Plaintiff on the basis of gender by, inter alia, paying her less than similarly situated male coaches.

148.    KSU discriminated against Plaintiff on the basis of gender by, inter alia, paying her

wages at a rate less than the rate paid to male employees for equal work as a head coach, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

149. KSU had actual knowledge of its gender-based pay inequality toward Coach Wiler at the time it created intolerable working conditions for her.

150. Athletic departments across the country, including KSU, embody and perpetuate the stereotyped notions that male sports and male athletes are more valuable than female sports and female athletes; that male coaches are inherently better than female coaches; that male coaches are *worth* more than female coaches, regardless of the female coaches' success; and that women will never be worth as much as men in the workplace or on the athletic field. *See* Jocelyn Samuels and Galles, K., *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 MARQ. SPORTS L. REV. 11 (2003).

151. KSU denied Coach Wiler equitable compensation despite her education, experience, seniority, merit, productivity, workload, and better work performance than her similarly situated male comparators;.

152. KSU relied on gender stereotypes when determining, among other things, Coach Wiler's compensation.

### COUNT I
### VIOLATIONS OF TITLE VII, 42 U.S.C. § 2000e-2(a)(1)
### WAGE DISCRIMINATION AND RETALIATION

153. Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

154. Plaintiff suffered a continuing practice of pay discrimination when KSU paid Plaintiff less than her male counterparts.

155. Plaintiff voiced her concerns regarding unequal pay to her supervisors.

156.     As a result of her complaint, Defendant retaliated against Plaintiff by refusing to repair the pay discrimination and effectively and continually altering plaintiff's working conditions with each discriminatory paycheck.

157.     As a result of the refusal to repair ongoing discrimination, it was both reasonable and foreseeable for Coach Wiler to resign her employment in a constructive discharge and recover future lost wages from KSU.

158.     KSU knew or should have known that its actions as described above would result in a reasonable person's constructive discharge.

159.     Plaintiff has preserved her claims and seeks to recover for pay discrimination on a continuing basis from 2010 to the present.

160.     As a proximate result of Defendant's actions, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

161.     Plaintiff requests the relief set forth in Count IV.

**WHEREFORE,** Plaintiff demands judgment against Defendants in an amount that will fully and fairly compensate her for her lost wages, front pay and future wages, emotional distress, mental anguish, compensatory relief, and court costs, with interest as provided by law, and such other relief as the Court deems appropriate.

<u>**COUNT II**</u>
**VIOLATION OF THE EQUAL PAY ACT, 29 U.S.C. § 206(d)(1)**
**UNEQUAL PAY FOREQUAL WORK**

162.     Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

163.     The EPA prohibits employers from paying employees differently based on the gender of the employees.

164.    Plaintiff's job duties as a head coach of field hockey required equal or substantially similar skill, effort, and responsibility as those of her male counterparts.

165.    Plaintiff's job as head coach of women's field hockey was substantially equal to the jobs of male head coaches. 29 C.F.R. § 1620.13(a).

166.    Plaintiff suffered an adverse employment action when Defendant failed to pay her equally to her male counterparts.

167.    Plaintiff voiced her concerns regarding unequal pay to her supervisors.

168.    As a result of her complaint, Defendant retaliated against Plaintiff by refusing to repair the pay discrimination and effectively and continually altering plaintiff's working conditions with each discriminatory paycheck.

169.    As a result of the refusal to repair ongoing discrimination, it was both reasonable and foreseeable for Kathleen Wiler to resign her employment and recover future lost wages via a claim for constructive discharge.

170.    KSU knew or should have known that the failure of KSU to end the pay discrimination would result in a reasonable person's resignation and constructive discharge.

171.    As a proximate cause of Defendant's actions, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, physical harm, lost wages and benefits, and lost earning capacity.

172.    Plaintiff requests equitable relief set forth below in Count IV.

**WHEREFORE,** Plaintiff demands judgment against Defendants in an amount that will fully and fairly compensate her for her lost wages, front pay and future wages, emotional distress, mental anguish, compensatory relief, and court costs, with interest as provided by law, and such other relief as the Court deems appropriate.

## COUNT III
### VIOLATION OF TITLE IX, 20 U.S.C. § 1681
### GENDER DISCRIMINATION IN EDUCATION
### IMPACT OF EQUITY IMBALANCES ON EQUAL WORK AND UNEQUAL PAY

173.    Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

174.    Title IX prohibits policies and practices that prohibits employers from paying employees differently on the basis of gender.

175.    Plaintiff suffered an adverse employment action when Defendant failed to pay her equally to her male counterparts.

176.    KSU has provided and continues to provide unequal support for women's programs and or has not achieved full equality for men's and women's sports.   As such, KSU cannot rest pay decisions based on any factor impacted by a failure to comply with Title IX, either at KSU or by relying on factors that exist at other universities also not in full compliance with Title IX.

177.    Plaintiff voiced her concerns regarding unequal pay to her supervisors.

178.    As a result of her complaint, Defendant retaliated against Plaintiff by refusing to repair the pay discrimination and effectively and continually altering plaintiff's working conditions with each discriminatory paycheck.

179.    As a result of the refusal to repair ongoing discrimination, it was both reasonable and foreseeable for Kathleen Wiler to resign her employment and recover future lost wages via a claim for constructive discharge.

180.    KSU knew or should have known that the failure of KSU to end the pay discrimination would result in a reasonable person's resignation and constructive discharge.

181.    As a proximate cause of Defendant's actions, Plaintiff has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, physical harm, lost wages and benefits, and lost earning capacity.

29

182.    Defendant's actions were willful and warrant the imposition of punitive damages.

183.    Plaintiff requests equitable relief set forth in Count IV.

**WHEREFORE,** Plaintiff demands judgment against Defendants in an amount that will fully and fairly compensate her for her damages, for punitive damages in an amount sufficient to punish Defendants and deter others, for lost wages, front pay and future wages, emotional distress, mental anguish, compensatory relief, and court costs, with interest as provided by law, and such other relief as the Court deems appropriate.

<u>**COUNT IV**</u>
**EQUITABLE RELIEF AFFORDED BY TITLE VII, THE EPA, AND TITLE IX**

184.    Plaintiff re-alleges all preceding paragraphs as if fully set forth herein.

**WHEREFORE**, Plaintiff respectfully requests the Court grant the following relief:

A.  Grant equitable relief in the form of orders requiring Defendant to:

    i.    Refrain from engaging in any employment practice that discriminates on the basis of gender or that permits gender bias and stereotyping to affect pay decisions;

    ii.    Provide training to its supervisory employees regarding how to effectively avoid engaging in gender discriminatory practices and to report to the Court every six months for a period of 3 years on the training provided and its effectiveness;

    iii.    Test and evaluate supervisory employees to assure they do not exhibit or act upon biased attitudes and opinions regarding females, do not tolerate disparate treatment based on gender by their subordinates, and report annually to the court for a period of 3 years on its testing and evaluation.

    iv.    Implement a de-biasing approach to assess all pay decisions for women currently employed at KSU.

B.  In addition to the equitable remedies afforded through Title VII and the EPA, Title IX offers additional remedies via § 106.3 Remedial and affirmative action and self-evaluation.

i.   (a) Remedial action. If the Assistant Secretary finds that a recipient has discriminated against persons on the basis of sex in an education program or activity, such recipient shall take such remedial action as the Assistant Secretary deems necessary to overcome the effects of such discrimination.

ii.  (b) Affirmative action. In the absence of a finding of discrimination on the basis of sex in an education program or activity, a recipient may take affirmative action to overcome the effects of conditions which resulted in limited participation therein by persons of a particular sex. Nothing herein shall be interpreted to alter any affirmative action obligations which a recipient may have under Executive Order 11246.

iii. (c) Self-evaluation. Each recipient education institution shall, within one year of the effective date of this part:

iv.  (1) Evaluate, in terms of the requirements of this part, its current policies and practices and the effects thereof concerning admission of students, treatment of students, and employment of both academic and non-academic personnel working in connection with the recipient's education program or activity;

v.   (2) Modify any of these policies and practices which do not or may not meet the requirements of this part; and (3) Take appropriate remedial steps to eliminate the effects of any discrimination which resulted or may have resulted from adherence to these policies and practices.

vi.  (d) Availability of self-evaluation and related materials. Recipients shall maintain on file for at least three years following completion of the evaluation required under paragraph (c) of this section, and shall provide  to the Assistant Secretary upon request, a description of any modifications made pursuant to paragraph (c)(ii) of this section and of any remedial steps taken pursuant to paragraph (c)(iii) of this section.

C.    Award Plaintiff her lost earnings and the value of her lost benefits;

D.    Order Defendant to make Plaintiff whole by providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life;

E.    Order Defendant to make Plaintiff whole by awarding back pay as permitted by law and making front-pay adjustments to remove the continuing effects of discrimination;

31

**Ex. 1, Pg. 31**

F.      Award Plaintiff a judgment against Defendant for her reasonable attorneys' fees and costs;

G.      Award pre-judgment interest, against Defendant, as allowed by law; and

H.      Grant such further relief as the Court deems necessary and proper.

## JURY DEMAND

**COMES NOW** the Plaintiff and hereby requests a trial by jury in the above-captioned matter.

Respectfully Submitted,

NEWKIRK ZWAGERMAN, P.L.C.

  _/s/Thomas Newkirk_____
Thomas Newkirk AT0005791, *(pro hac vice)*
tnewkirk@newkirklaw.com
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Ph: 515-883-2000
Fax: 515-883-2004

and

Caryn Groedel
Ohio Supreme Court no.:  0060131
cgroedel@groedel-law.com
Caryn Groedel & Associates Co., LPA
31340 Solon Road, Suite 27
Cleveland, OH 44139
Ph: 440-544-1122
Fax: 440-996-0064

**ATTORNEYS FOR PLAINTIFF**

**Ex. 1, Pg. 32**