IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN WILER, | Case No: 5:20-CV-00490 |
| Plaintiff, | |
| v. | JUDGE J. PHILIP CALABRESE |
| KENT STATE UNIVERSITY, | |
| Defendant. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGEMENT**

# TABLE OF CONTENTS

Statement of Facts -------------------------------------------------------------------------- 5

Argument------------------------------------------------------------------------------------- 7

    A.    Summary Judgment Standard --------------------------------------------------- 7

    B.    KSU IS Not Entitled to Summary Judgment on Coach Wiler's Title VII Claim- 7

        1.   Coach Wiler Was Paid Less Than Similarly Situated Male Coaches ------------- 8

        2.   Coach Wiler is Similarly Situated to Coaches Marinaro, Oakley, and

           Andrassy ---------------------------------------------------------------------10

        3.   KSU's Has Not Met Its Burden In Proffering A Legitimate, Non-Discriminatory

           Reason For The Pay Disparities --------------------------------------------15

    C.    KSU Is Not Entitled to Summary Judgment of Coach Wiler's EPA Claim------18

       1.   KSU Has Not Met Its Burden In Proving Its Affirmative Defense. ------------19

       2.   Defendant's Reliance on Coach Wiler's Deposition Testimony Is Misplaced 20

       3. KSU's Violation Was Willful, Extending Coach Wiler's Claim to September 5,

         2014. --------------------------------------------------------------------------22

Conclusion ---------------------------------------------------------------------------------23

2

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ---------- 7

*Beck-Wilson v. Principi*, 441 F.3d 353 (6th Cir. 2006) -------------------------------------------------- 19

*Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007)-------------------------------------------- 8

*Briggs v. Univ. of Cincinnati*, 11 F.4th 498 (6th Cir. 2021)-------------------------------------------- 7

*Brooks v. Tire Discounters, Inc.*, No. 3:16-cv-02269, 2018 WL 124344, (M.D. Tenn. March 8, 2018)-------------------------------------------------------------------------------------------------------------22

*Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796 (6th Cir. 1998) ---------------------------- 18, 19

*Carey v. Foley & Lardner LLP*, 577 F. App'x 573 (6th Cir. 2014) --------------------------------22

*Cnty. of Washington v. Gunther*, 452 U.S. 161, 101 S. Ct. 2242, 68 L. Ed. 2d 751 (1981) -------- 8

*Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974)----------18

*Cox v. Kty. Dept. of Transp.*, 53 F.3d 146 (6th Cir. 1995)------------------------------------------- 7

*Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000) ------------------------------------------- 8

*Ellis Fischel State Cancer Hospital v. Marshall*, 629 F.2d 563 (8th Cir. 1980) --------------------20

*Equal Employment Opportunity Comm'n v. Romeo Community Schs.*, 976 F.2d 985 (6th Cir.1992) ------------------------------------------------------------------------------------------------------19

*Equal Employment Opportunity Comm'n v. State of Delaware Dep't of Health and Soc. Servs.,* 865 F.2d 1408 (3d Cir.1989)------------------------------------------------------------------------19

*Grano v. Department of Development, City of Columbus,* 699 F.2d 836 (6th Cir. 1983) --------- 16

*Griffin v. Finkbeiner*, 689 F.3d 584 (6th Cir. 2012)------------------------------------------------- 8

*Guadagno v. Wallack Ader Levithan Assocs.*, 950 F. Supp. 1258 (S.D.N.Y. 1997) ---------------21

*Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir.)--------------------------------------------------- 8

*Hardin v. Pitney-Bowes, Inc.*, No. 78-3679 (W.D. Ky.1978) ---------------------------------------17

3

*Horner v. Mary Institute*, 613 F.2d 706 (8th Cir. 1980) ------------------------------------------------16

*Jones v. Trane US, Inc.*, M.D. Tenn. No. 3:19-0453, 2020 WL 5088211, (Aug. 28, 2020) ------22

*Keene v. Ebasco Constructors, Inc.*, 95-ERA-4 (ARB Feb. 19, 1997) -----------------------------20

*Kouba v. Allstate Ins. Co.*, 691 F.2d 873 (9th Cir. 1982) --------------------------------------------16

*Lewis v. Smith*, 255 F. Supp. 2d 1054 (D. Ariz. 2003) -----------------------------------------------16

*Mackowiak v. University Nuclear Systems, Inc.*, 735 F.2d 1159 (9th Cir. 1984) -------------------20

*Marra v. Philadelphia Housing Auth.*, 497 F.3d 286 (3d Cir. 2007) ---------------------------------21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). ----------------------------------------------------------------------------------------------- 7

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) --------------------------------------------22

*Odomes v. Nucare, Inc.,* 653 F.2d 246 (6th Cir.1981).----------------------------------------------18

*Olson v. General Elec. Astrospace*, 101 F.3d 947 (3d Cir. 1996) -----------------------------------21

*Peters v. City of Shreveport*, 818 F.2d 1148 (5th Cir. 1988) ----------------------------------------19

*Proffitt v. Anacomp, Inc.*, 747 F.Supp. 421 (S.D. Ohio 1990) ----------------------------------- 16, 17

*Senter v. General Motors Corp.*, 532 F.2d 511 (6th Cir.) ------------------------------------------16

*Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555 (6th Cir. 2004)-----------------18

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966) ---------------------------------------- 20, 21

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 2017 (1981)------------------------------------------------------------------------------------------------------- 8

*Thomas v. Doan Constr. Co.*, No. 13–11853, 2014 WL 1405222 (E.D. Mich., April 11, 2014)-22

*Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633 (5th Cir. 1985). -----------------17

*Weaver v. Ohio State University*, 71 F. Supp. 2d 789 (S.D. Ohio 1998) ----------------------------10

*Weiss v. Union Cent. Life Ins. Co.*, 28 F. App'x 87 (2d Cir. 2002) ---------------------------------21

*White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232 (6th Cir. 2005) ------------------------------ 7

<u>**STATEMENT OF FACTS**</u>

From March 2006 to February 2019, Plaintiff Kathleen Wiler was a highly successful coach of Defendant Kent State University's women's field hockey team. Wiler Decl. (Doc. #: 56, PageID # 1926). During her 13 years at the helm of the field hockey team, she was consistently one of the most successful coaches at KSU. Wiler Decl. (Doc. #: 56, PageID # 1926). Her achievements include being named the Mid-American Conference ("MAC") Coach of the Year 5 times, 5 NCAA tournament appearances, 8 MAC regular season titles, and 5 MAC tournament titles. (Doc. #: 54-1, PageID # 1932).

In approximately February 2016, Coach Wiler began attempting to negotiate the renewal of her contract, which was set to expire in June 2016. Wiler Dep. (Doc. #: 50, PageID #: 764–65). Coach Wiler's team had just finished another highly successful season, winning its third-consecutive MAC regular season championship, third-consecutive MAC Tournament Championship, and making its third-consecutive NCAA tournament appearance. Wiler Decl. (Doc. #: 56, PageID # 1926). As part of the negotiation process, she submitted a written proposal to KSU's then-Athletic Director Joel Nielsen. Wiler Decl. (Doc. #: 56, PageID #: 1927). Coach Wiler requested that her base salary be increased to $80,000 per year, which would have made her the second highest paid coach within the MAC, a reasonable request given that she was, by far, the most successful field hockey coach in the MAC. Wiler Decl. (Doc. #: 56, PageID #: 1927).

Over the next several months, Coach Wiler attempted to negotiate her contract and voiced her concerns with AD Nielsen that, at the time, she was the only female head coach at KSU, and had the lowest base pay of any coach, despite having greater success. Wiler Decl. (Doc. #: 56, PageID ##: 1926–27). Wiler Dep. (Doc. #: 50, PageID #: 817–18). After Coach Wiler raised pay equity concerns, AD Nielsen stopped engaging in substantive negotiations. Wiler Dep. (Doc. #:

5

50, PageID #: 807). Despite Coach Wiler's complaints, AD Nielsen did nothing to investigate whether gender-based discrimination was occurring within the Athletic Department. Nielsen Dep. p. 38 (Doc.#: 54, PageID #: 1890). He refused to negotiate the terms of her contract and, ultimately, Coach Wiler signed a 3-year contract after AD Nielsen told her "take it or leave it." Wiler Decl. (Doc. #: 56, PageID # 1927). The contract provided for an initial base salary of $76,500 and only approximately half of the performance incentives that Coach Wiler requested. Nielsen Decl., Ex. F. (Doc. #52-6, PageID #: 1172). This resulted in Coach Wiler remaining amongst the lowest paid coaches at KSU for the remainder of her career there. Wiler Decl. (Doc. #: 56, PageID # 1927).

Knowing that she was being paid less due to her gender, Coach Wiler hired legal counsel in early 2017 in an attempt to have KSU investigate gender-based pay disparities and to renegotiate her contract. Wiler Decl. (Doc. #: 56, PageID #: 1930). When KSU failed to do either, Coach Wiler filed a discrimination charge with the Ohio Civil Rights Commission in September 2017. (Doc. #: 50, PageID #: 907–08). This also did not result in KSU taking any remedial action. As the end of Coach Wiler's 2016–2019 contract came to an end, Coach Wiler knew she would soon have to again enter negotiations to renew her contract. Wiler Decl. (Doc. #: 56, PageID # 1931). Distressed at the thought of going through the process again after KSU had, for 3 years, failed to address her concerns of wage discrimination, Coach Wiler tendered her resignation effective February 28, 2019. Wiler Dep. (Doc. #: 50, PageID #: 897, 917); Wiler Decl. (Doc. #: 56, PageID # 1931).

Coach Wiler filed the above-captioned matter on March 3, 2020, alleging wage discrimination in violation of the Equal Pay Act and Title VII. KSU now moves for summary judgment. As explained below, KSU is not entitled to summary judgment on either claim and, therefore, its motion should be denied in its entirety.

<u>ARGUMENT</u>

### A.  <u>Summary Judgment Standard</u>

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper only when the movant demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Cox v. Kty. Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995) (noting that it is the moving party's burden to demonstrate its entitlement to summary judgment). Courts must view the facts in the record and all reasonable inferences that can be drawn from those facts in the light most favorable to the non-moving. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a request for summary judgment, courts do not weigh evidence, assess the credibility of witnesses, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B.  <u>KSU IS Not Entitled to Summary Judgment on Coach Wiler's Title VII Claim</u>

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). It is a violation of Title VII to discriminate against an employee in the wages paid to her because of her membership in a protected class. *See, e.g.*, *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005). In order to establish a prima facie case of pay discrimination under Title VII, a plaintiff must establish that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly situated employees outside of the protected class. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (citing *CiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). "[A] Plaintiff does need to show substantial equality to pursue a Title VII claim." *Lewis v. Smith*, 255 F. Supp.

2d 1054, 1060 (D. Ariz. 2003). "Title VII contains a broader prohibition on discriminatory wages than that mandated by the Equal Pay Act. *Id.* (citing *Cnty. of Washington v. Gunther*, 452 U.S. 161, 170–71, 101 S. Ct. 2242, 68 L. Ed. 2d 751 (1981)). Furthermore, a plaintiff's burden at the prima facie stage is not onerous. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 2017 (1981).

Once the prima facie case is established, the defendant bears the burden of articulating a legitimate, non-discriminatory reason for the pay disparity. *Id.* at 508–09. The burden then shifts to the plaintiff to establish that the proffered reason for the pay disparity is false or otherwise pretextual. *Id.* at 509. Pretext is demonstrated by a showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

In order to survive summary judgment, a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not disprove, the defendant's proffered rationale. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007). The plaintiff is also not required to produce evidence that discrimination was the real reason for the adverse employment action. *Id. See also Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir.) ("[W]e do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment (internal quotation marks omitted).

### 1. Coach Wiler Was Paid Less Than Similarly Situated Male Coaches

Coach Wiler has easily met her burden to show that she was paid less than similarly situated male coaches. For purposes of this analysis and summary judgment, Coach Wiler identifies the

following coaches as similarly situated: softball coach Eric Oakley, women's soccer coach Roberto Marinaro, and men's wrestling coach Jim Andrassy. Between 2016 and 2018 (the last year in which Coach Wiler worked a full year at KSU), Coach Wiler was the least paid of all of these coaches, as established by pay stubs provided for each coach by KSU.

|          | 2018        | 2017        | 2016        |
|----------|-------------|-------------|-------------|
| Oakley   | $93,943.12  | $95,236.00  | $99,396.52  |
| Marinaro | $99,063.04  | $107,198.16 | $96,240.24  |
| Andrassy | $106,891.60 | $96,926.72  | $101,318.12 |
| Wiler    | $87,377.30  | $95,056.24  | $85,496.45  |

Wiler Decl. (Doc #: 56, PageID #: 1928).

KSU attempts to sidestep this pay disparity by focusing only on the base salary of each coach. (Doc #: 53-1, PageID #: 1861). However, the supplemental pay that coaches receive is also part of their negotiated contracts (e.g., stipends for vehicles, the number of performance bonuses available, and the value of each, etc…). Nielsen Depo. pp. 23–24 (Doc. #: 54, Page ID # 1886). Coach Wiler was an extremely successful coach. The above data establishes that the overall value of Coach Wiler's contract was diminished relative to her male counterparts.

Furthermore, in 2015, Coach Wiler's base pay was also lower than Marinaro's and Andrassy's.[1] As of October 2015, Coach Wiler was earning a base salary of $70,709.89; Coach Andrassy was earning $79,498; Coach Marinaro was earning  $73,728. Wiler Decl. (Doc #: 56, PageID #: 1926). Additionally, rather than use the money for herself, Coach Wiler provided most of the income earned from field hockey camps to help supplement the pay of her 2 assistant

---

[1] Coach Oakley is no included in this analysis because he had not yet taken over the softball program from former softball coach Karen Linder.

9

coaches, both of whom were also significantly underpaid compared to the assistant coaches of the counterpart teams. (Doc. #: 54, Page ID # 1886).

### 2.  Coach Wiler is Similarly Situated to Coaches Marinaro, Oakley, and Andrassy

In evaluating whether coaches are similarly situated, courts consider a variety of factors, including "team size, the number of assistant coaches, recruiting responsibilities, the amount of spectator attendance and community interest in the sport, the amount of revenue generated by the sport, the degree of responsibility in the area of public and media relations and promotional activities, and the relative importance of the sport in the athletic program as a whole. *Weaver v. Ohio State University*, 71 F. Supp. 2d 789, 800 (S.D. Ohio 1998).

KSU, like many athletic programs, prioritizes certain sports. During his deposition, AD Nielson explained that four of KSU's sports—football, men's basketball, women's basketball, and volleyball—are designated by the MAC as priority sports. Nielsen Dep. 21:17–22 (Doc. #: 54, PageID #: 1885). KSU also internally prioritized men's golf, women's golf, and baseball, meaning these teams had the enhanced expectation of competing at the national level. Nielsen Dep. 22:5–12. (Doc. #: 54, PageID #: 1886). The remaining sports—including field hockey, women's soccer, women's gymnastics, and men's wrestling—all had similar duties and expectations. Nielsen Dep. 22:25–23:5. (Doc. #: 54, PageID #: 1886). Thus, these programs, and their coaches, shared the same relative importance within KSU's athletic department.

Additionally, the basic duties and responsibilities of the coaches of these sports are, inarguably, the same. KSU has a standard job description that applies to all head coaches. Nielsen Dep. 18:22–19:20. (Doc. #: 54, PageID #: 1885). The job description lists the essential functions of the head coaching position as:

- Providing leadership for the team;

10

- Establishing coaching strategies and teaching methods to develop student athletes' skills and teamwork;

- Recruiting student athletes;

- Administering program budget, analyzing funding needs, and planning fund raising activities;
- Developing strategies to foster athletic and academic progress of student athletes;

- counseling and advising student athletes with personal and academic problems;

- Performing marketing and public relations duties;

- Supervising staff.

(Doc. #: 54-1, PageID #: 1899). AD Nielsen acknowledged that the job description, while general, encompasses the basic duties and responsibilities of all KSU coaches. Nielsen Dep. 20:2–9. (Doc. #: 54, PageID #: 1885). He further acknowledged that there are no significant differences in the responsibilities and competitive expectations of coaches of sports such as field hockey, wrestling, soccer, and softball. Nielsen Dep. 21:5–16. (Doc. #: 54, PageID #: 1885).

Coaches Wiler, Oakley, Marinaro, and Andrassy all supervised 2 assistant coaches. Their roster sizes were similar. Between 2015–2018, the softball team had 25–26 student athletes, Marinaro had  22–28 student athletes, Andrassy had 31–33 student athletes, and Coach Wiler had 23–26 student athletes. Wiler Decl. ( Doc. #: 56, PageID #: 1929).

### a. Marinaro is a proper comparator and was paid more despite having less success

Coach Marinaro, who became the head coach of women's soccer in approximately 2001, had similar seniority to Coach Wiler. Marinaro Dep. (Doc. #: 49, PageID #: 675). As of the 2016–2017 academic year, Coach Marinaro had been serving as head coach for 17 years, and Wiler had been the head coach for 12 years. (Doc. #: 56-1, PageID #: 1932).

Like field hockey, the soccer team's competitive season runs from August and into November. Marinaro Dep. (Doc. #: 49, PageID #: 684); Wiler Dep. (Doc. #: 50, PageID #: 748–49). Both teams play a 20-game schedule with about half taking place at home and the other half on the road. Marinaro Dep. (Doc. #: 49, PageID #: 689); Wiler Dep. (Doc. #: 50, PageID #: 752). Both coaches were responsible for arranging their team's respective schedules and travel. Marinaro Dep. (Doc. #: 49, PageID #: 690); Wiler Dep. (Doc. #: 50, PageID #: 753). Soccer, again like field hockey, generates some revenue from camps and fundraising, but neither program generates net revenue. Marinaro Dep. (Doc. #: 49, PageID #: 694). Both sports experienced low attendance (100–300 for soccer and 100 for field hockey) and spectators were not charged admission to attend. Marinaro Dep. (Doc. #: 49, PageID #: 693); Wiler Decl. (Doc. #: 56, PageID #: 1930).

Like Coach Wiler, Coach Marinaro recruits year-round and recruits at the national level; however, Coach Wiler also did a significant amount of international recruiting. Marinaro Dep. (Doc. #: 49, PageID #: 701); Wiler Decl. (Doc. #: 56, PageID #: 1930). During deposition, Coach Marinaro testified that coaching, in general, is an on-call job that requires being available to student athletes at most hours. (Doc. #: 49, PageID #: 703). He listed his basic day-to-day duties, including meeting with student athletes, creating practice plans, evaluations, watching video, scouting, and running practices. (Doc. #: 49, PageID #: 704). These are the same basic job functions Coach Wiler performed. Wiler Decl. (Doc. #: 56, PageID #: 1928). Indeed, Coach Marinaro testified, and Coach Wiler agrees, that these kinds of job duties are general to all coaches. Marinaro Dep. (Doc. #: 49, PageID #: 705); Wiler Decl. (Doc. #56, PageID1928). Given all of these factors, Coach Marinaro and Coach Wiler were similarly situated.

Between 2006 and 2016–17 academic year, Wiler's team experienced significantly more success, with the field hockey team racking up 8 regular season MAC championships and 5 MAC

Tournament championships, while Marinaro's soccer team had only 1 regular season championship and 1 tournament championship. (Doc. #: 56-1, PageID #: 1932). Nonetheless, Coach Marinaro was paid more than Coach Wiler.

### b. Coach Oakley is a proper comparator and was paid more despite having less success, less seniority, and less experience

As noted above, Coach Oakley's basic duties, responsibilities, and expectations were similar to Coach Wiler. Indeed, when asked if there were any differences between the basic functions of his job and Coach Wiler's, Coach Oakley testified only that the recruiting aspect is different because softball recruits regionally and not nationally or internationally. Oakley Dep. (Doc. #: 55, PageID #: 1914). Softball's competitive season runs from early February to May, depending on how far the team advances. Oakley Dep. p. 19 (Doc. #: 55, PageID #: 1911). Like Coach Wiler, Coach Oakley was responsible for travel arrangements. Oakley Dep. p. 21 (Doc. #: 55, PageID #: 1911). Spectators are not charged admission and the softball program does not generate net revenue for the Athletic Department. Oakely Dep. pp. 24–25 (Doc. #: 55, PageID #: 1912). Coach Oakley has minimal public relations responsibilities, only occasionally talking to local reporters and posting on posting on social media. Oakley Dep. p. 27 (Doc. #: 55, PageID #: 1913).27 Coach Wiler's public relations duties were nearly identical. Wiler Decl. (Doc. #: 56, PageID #: 1928). Thus, Coach Oakley and Coach Wiler jobs were substantially similar.

However, Coach Oakley was paid more despite having less seniority, less established success, and less overall experience. He joined KSU's women's softball program in July 2014 and became the head coach in August 2015. Oakley Dep. pp. 5–6 (Doc. #: 55, PageID ##: 1907–08). Coach Oakley has less education than Coach Wiler, having obtained only a bachelor's degree compared to Coach Wiler's master's degree. Oakley Dep. pp. 9–10 (Doc. #:55, PageID #: 1908–

09). Coach Oakley has significantly less coaching experience than Coach Wiler. He has been coaching collegiate softball since 2006 and had only 3 years of head coaching experience at the time he was hired to take over the softball program. Oakley Dep. pp. 7–8 (Doc. #: 55, PageID #: 1908). Furthermore, Coach Oakley never played softball, or any other sport, at any competitive level, while Coach Wiler began playing her respective sport at age 11 and played competitively through high school. Oakley Dep. p. 10 (Doc. #: 55, PageID #: 1908). Yet, despite these vast differences in qualification and experience, Coach Oakley was paid more than Coach Wiler.

### c. Andrassy is a proper comparator and is paid more despite significantly less success.

Coach Andrassy became the head coach of KSU men's wrestling program in 2003. (Doc. #: 50, PageID #: 849). As AD Nielsen, Coach Wiler, Coach Oakley, and Coach Marinaro all testified, Coach Andrassy's job duties mirrored their own because he was the head coach of a non-priority sport. KSU seeks to remove Coach Andrassy as a possible comparator simply by noting that his competitive season is 5.5–6 months compared to the 3-month competitive season for Coach Wiler. Def. Br. at 13 (Doc. #: 53-1, PageID #: 1866). While wrestling's competitive season may last longer, the two sports have a similar number of actual competitions: wrestling with 25 and field hockey with 20. (Doc. #: 56, PageID #: 1931). KSU also notes that wrestling's operating revenues were higher than field hockey's each year. (Def. Br. at 13, Doc. #: 53-1, PageID #: 1866). However, no sport at KSU generates net revenue and KSU's athletic department did not have any revenue expectations for its coaches. Wiler Decl. (Doc. #: 56, PageID #: 1928). Furthermore, in terms of duties and responsibilities, Coach Wiler's budgeting duties far exceeded Coach Andrassy's and were comparable to Coach Marinaro's and Coach Oakley.

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| **Wrestling** | $528,497.29 | $641,997.92 | $641,859.74 |

14

| Softball | $833,613.67 | $851,964.75 | $833,406.16 |
| Soccer | $770,813.88 | $834,076.41 | $878,077.09 |
| Field Hockey | $770,673.07 | $839,275.24 | $857,113.56 |

Wiler Decl. (Doc. #: 56, PageID #: 1930).

### 3. KSU's Has Not Met Its Burden In Proffering A Legitimate, Non-Discriminatory Reason For The Pay Disparities

KSU's primary justification for the pay disparities is its assertion that KSU determined base salaries based on the objective factor of the "market rate paid to head coaches of each sport within the MAC." (Def. MSJ at 5, Doc. #: 53-1, PageID #:1858). However, KSU admits that it paid some male coaches more than Coach Wiler based on subjective factors such as "the working conditions created by the unique demands of each individual sport—such as competitive expectation, season length, supervisory requirements, and operating revenues. (Def. MSJ at 5, Doc. #: 53-1, PageID #:1858).

KSU fails to explain, however, any objective way to measure these subjective factors. For instance, KSU suggests that one of the reasons volleyball coach Don Gromala is not a proper comparator is because volleyball plays more games than field hockey: 31 compared to 20. Nowhere does KSU explain, in an objective manner, how additional competitions translate into additional pay. In other words, if field hockey competed in 25 games, would that have qualified Coach Wiler for additional pay and, if so, how much.

Similarly, KSU attempts to justify Coach Wiler's lower pay with revenue statistics. Again, though, KSU offers no bright line revenue expectation that would have entitled Coach Wiler to a higher base salary. Coach Wiler was never told that there were any revenue expectations or that her pay might be tied to any such expectation. Wiler Decl. (Doc. #: 56, PageID #: 1929). In general,

KSU fails to offer any objective way to measure other factors it considers. For instance, it could have a policy stating that 20% of a coach's pay is based on revenue generated, 10% is based on seniority, 15% is based on the length of the season or the number of matches played, etc. KSU does not offer any such objective way to measure these factors.

The Sixth Circuit has previously recognized that subjective decisions provide a ready mechanism for discrimination. And, of course, the ultimate issue is whether subjective criteria were used to disguise discriminatory action. *Grano v. Department of Development, City of Columbus,* 699 F.2d 836, 837 (6th Cir. 1983); *Senter v. General Motors Corp.*, 532 F.2d 511, 528-29 (6th Cir.), cert. denied, 429 U.S. 870 (1976); *Proffitt v. Anacomp, Inc.*, 747 F.Supp. 421, 427 (S.D. Ohio 1990).

Furthermore, reliance on the market rate, without more, is not sufficient to establish an equal pay defense. *Lewis v. Smith*, 255 F. Supp. 2d 1054, 1063 (D. Ariz. 2003). In particular, a "market forces" defense requires that defendant analyze the market value of the plaintiff's particular skills relative to the market. *Id.* In other words, even if KSU were making pay decisions based on the market rate of its coaches, it would be required to evaluate the value of each individual coach's particular skill set within that market. *Id. See also Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876–77 (9th Cir. 1982); *Horner v. Mary Institute*, 613 F.2d 706, 714 (8th Cir. 1980) (noting that "an employer may consider the market place value of *the skills of a particular individual* when determining his or salary" (emphasis added)). Thus, in order to rely on the market rate defense, KSU must establish that it analyzes each coach's specific value within the marketplace, not simply establish that field hockey coaches in general are paid lower than the coaches of the other sports identified.

16

For instance, Coach Wiler's base pay was similar to and sometimes a few thousand dollars higher than the average base salary for MAC field hockey coaches. (Doc. #: 52-67, PageID #: 1842). However, given her level of success compared to, for instance, Coach Marinaro, there is no legitimate reason why her base salary is only slightly above the average while Marinaro was consistently $8–10,000 above the average. (Doc. #: 52-67, PageID #: 1842).

In general, summary judgment is inappropriate in employment discrimination cases "which involve nebulous questions of motivation and intent." *Proffitt v. Anacomp, Inc.*, 747 F.Supp. 421, 427 (S.D. Ohio 1990) (Steinberg, Mag. J.), quoting *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 640-641 (5th Cir. 1985).  As the *Proffitt* court stated:

> [o]ften, motivation and intent can only be proved through circumstantial evidence; determinations regarding motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of th Thuse factfinder.... [I]t is difficult to determine what evidence might legitimately sway the factfinder and hence be material.  Thus, if any (material) facts are in dispute, summary judgment is generally inappropriate.

*Id.*

In Proffitt, this Court quoted with approval Justice Rehnquist's dissent from denial of certiorari in an age discrimination case, stating:

> [i]t is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment.  It is equally clear that where such issues are presented, the submission of affidavits or depositions is insufficient to support a motion for summary judgment. . . . Summary judgment simply may not be granted when such matters as the defendant's motive and intent are questioned.

*Proffitt*, 747 F.Supp. at 427, quoting *Hardin v. Pitney-Bowes, Inc*., No. 78-3679 (W.D. Ky.1978) (unpublished), aff'd, 636 F.2d 1217 (6th Cir. 1980), cert. denied, 451 U.S. 1008, 1008-09, 1010 (1981) (Rehnquist, J.).

The overriding issue in this case—as in any discrimination case—is intent. Intent is inherently a factual issue for a jury to resolve at a trial, not for a court to resolve in the context of a summary judgment motion.  In discrimination cases, an employer's true motivations are particularly difficult to ascertain.  In *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004), the Court of Appeals held that "caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence", and agreed with other courts that "once a prima facie case is established either by the introduction of direct evidence or reliance on the McDonnell Douglas presumption, summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination'".  *Singfield*, 389 F.3d at 564 (quoting *Burdine*, 450 U.S. at 255 n. 8).

### C.  <u>KSU Is Not Entitled to Summary Judgment of Coach Wiler's EPA Claim</u>

A plaintiff establishes a prima facie case of wage discrimination under the Equal Pay Act by showing that "an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 94 S. Ct. 2223, 2228, 41 L. Ed. 2d 1 (1974) (internal quotation marks omitted)). Furthermore,

> "[e]qual work" does not require that the jobs be identical, but only that there exist "substantial equality of skill, effort, responsibility and working conditions." *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir.1981). Whether the work of two employees is substantially equal "must be resolved by an overall comparison of the work, not its individual segments." *Id.*. . . .
> . . . .

18

Once the plaintiff establishes a prima facie case, the defendant must "prove" that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex. *See Corning Glass Works*, 417 U.S. at 196, 94 S.Ct. at 2229. Because these nongender-based explanations for the wage differential are affirmative defenses, the defendant bears the burden of proof.[6] *See id.* at 197, 94 S.Ct. at 2229; *see also Equal Employment Opportunity Comm'n v. Romeo Community Schs.*, 976 F.2d 985, 988 (6th Cir.1992). Thus, to survive the defendant's motion for judgment as a matter of law, the EPA plaintiff need not set forth evidence from which a jury could infer that the employer's proffered reason for the wage differential is pretextual. As the party who bears the burden of persuasion, the defendant who makes a motion under Rule 50(a) must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex. *See id.* at 989. Thus, the district court's granting of the Board's motion for judgment as a matter of law was proper "only if the record shows that they established the defense so clearly that no rational jury could have found to the contrary." *Equal Employment Opportunity Comm'n v. State of Delaware Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1414 (3d Cir.1989).

*Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d 796, 799–800 (6th Cir. 1998). Finally, "proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." *Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006) (quoting *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir. 1988)). Thus, once a plaintiff establishes a prima facie case, summary judgment is appropriate "only if the record shows that [KSU] established the ["factor other than sex"] defense so clearly that no rational jury could have found to the contrary." *Schleicher*, 831 F.3d at 753)

### 1.  KSU Has Not Met Its Burden In Proving Its Affirmative Defense.

A prima facie claim under the Equal Pay Act is analyzed similar to a gender-based wage discrimination claim under Title VII. Thus, for the reasons stated above, Coach Wiler has established her prima facie case under the EPA.

Once the prima facie claim is established, it is KSU's sole burden to establish its affirmative defense that it relied on a factor "other than sex." *Buntin v. Breathitt Cty. Bd. of Educ.*, 134 F.3d

796, 799–800 (6th Cir. 1998). And Coach Wiler need not establish intent. *Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006). Thus, the only issue in dispute is whether KSU has met it's burden. It has not, and therefore, summary judgment is inappropriate.

KSU's sole argument in support of its affirmative defense is that it relied on market data in determining both Coach Wiler's pay and that of her comparators. However, has noted in Section B.3, above, KSU has not established this defense because it has not offered any evidence that it specifically analyzed the value of the unique skills of each coach relative to the market.

### 2.  Defendant's Reliance on Coach Wiler's Deposition Testimony Is Misplaced

Defendant states that Wiler "does not know whether she was ever discriminated against on the basis of sex by AD Nielsen or anyone else at the University" Def. Br. at 4. (Doc. #: 53-1, PageID # 1857, citing Wiler Dep., Doc # 50, Page ID # 816, 834-35, 870, 912-913), or whether "she was a victim of intentional discrimination.  Accordingly, there is no genuine dispute of material fact that the sex-neutral considerations advanced by the University are not a pretext for intentional discrimination."  Def. Br. at 5–6. (Doc. #: 53-1, PageID # 1858–59.)  However, a plaintiff's subjective belief is immaterial.  In *Keene v. Ebasco Constructors, Inc*., 95-ERA-4 (ARB Feb. 19, 1997), at p. 10, the Department of Labor's Administrative Review Board stated that "the presence or absence of retaliatory motive is provable by circumstantial evidence even if a witness testifies that he did not perceive such a motive."  See also, *Ellis Fischel State Cancer Hospital v. Marshall*, 629 F.2d 563, 566 (8th Cir. 1980), cert. denied, 450 U.S. 1040 (1981), and *Mackowiak v. University Nuclear Systems, Inc*., 735 F.2d 1159, 1162 (9th Cir. 1984).

In *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966), defense counsel's examination of the plaintiff at her deposition revealed, as related by the Supreme Court, "that she did not understand the complaint at all, that she could not explain the statements made in the complaint,

that she had a very small degree of knowledge as to what the lawsuit was about, that she did not

know any of the defendants by name, that she did not know the nature of their alleged misconduct,

and in fact that in signing the verification she had merely relied on what her [lawyer] had explained

to her about the facts in the case." Id. at 366.  The District Court dismissed the verified complaint

on that basis, and the dismissal was affirmed by the Seventh Circuit.  However, the Supreme Court

reversed, holding that what mattered was the evidence and the law, not what the plaintiff personally

did or did not know. *Id*. at 372. The Supreme Court also noted that "[t]he basic purpose of the

Federal Rules is to administer justice through fair trials, not through summary dismissals as

necessary as they may be on occasion."  Id. at 373.

The same rationale has been applied in retaliation cases, in which courts have held that a

plaintiff's opinion that she did not believe a particular decision maker retaliated against her does

not preclude a finding of pretext.  *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 307-08 (3d

Cir. 2007); *Olson v. General Elec. Astrospace*, 101 F.3d 947, 955 (3d Cir. 1996).  Few plaintiffs

are trained lawyers, and rarely understand the legal theories on which their claims are based.  They

make honest mistakes, forget pertinent facts, and misunderstand the significance of the questions

they're asked.  See, e.g., *Weiss v. Union Cent. Life Ins. Co.*, 28 F. App'x 87, 89 (2d Cir. 2002);

*Guadagno v. Wallack Ader Levithan Assocs.*, 950 F. Supp. 1258, 1261 (S.D.N.Y. 1997).

Finally, long before filing this lawsuit, Coach Wiler had often made it clear that she

believed that she was being paid in a discriminatory manner. Coach Wiler raised pay equity

concerns to AD Nielsen during her contract negotiations. She raised those concerns again through

legal counsel when she attempted to renegotiate her contract and again when she filed her charge

of discrimination with the Equal Employment Opportunity Commission.

### 3. KSU's Violation Was Willful, Extending Coach Wiler's Claim to September 5, 2014.

As KSU correctly notes, "[t]he limitations period for an Equal Pay Act claim is two years, unless the violation is willful, in which case the limitations period is three years." *Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 576 (6th Cir. 2014). A violation is willful if the defendant "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." *Jones v. Trane US, Inc.*, M.D. Tenn. No. 3:19-0453, 2020 WL 5088211, *10 *(Aug. 28, 2020) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). "Courts within the Sixth Circuit have generally found the willfulness standard met where there is evidence in the record that the employer actually knew that its conduct violated the [statute] or was placed on notice that its conduct might violate the statute, [for instance] by prior complaints or lawsuits brought by employees, or otherwise. *Brooks v. Tire Discounters, Inc.*, No. 3:16-cv-02269, 2018 WL 124344, *8 (M.D. Tenn. March 8, 2018). Additionally, [c]ourts have also found willfulness in situations in which the employer deliberately chose to avoid researching the laws' terms or affirmatively evad[e] them." *Id.* (citing *Thomas v. Doan Constr. Co.*, No. 13–11853, 2014 WL 1405222, at *14 (E.D. Mich., April 11, 2014)).

In this case, KSU was "placed on notice" no later than when Coach Wiler specifically complained to AD Nielsen during the 2016 contract negotiations that she was being paid in a discriminatory manner. Wiler Decl. (Doc. #: 56, PageID #: 1927). AD Nielsen made no attempt to investigate this complaint. Nielsen Dep. (Doc. #: 54, PageID #: 1890). Thus, there remains a material fact in dispute with regard to whether KSU's EPA violation was willful.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully request the Court deny the Defendant's

Motion for Summary Judgment and proceed to schedule a trial on the merits.

          <u>*/s/ Danya Keller*</u>
Thomas Newkirk AT0005791
Danya Keller AT0012300
NEWKIRK ZWAGERMAN, P.L.C.
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
Fax: 515-883-2004
Email: tnewkirk@newkirklaw.com
Email: dkeller@newkirklaw.com

Caryn M. Groedel, Esq. (0060131)
Caryn Groedel & Associate
Co., LPA
31340 Solon Road, Ste. 27
Cleveland, OH 44139
cgroedel@groedel-law.com
phone:  (440) 544-1122 x102
fax:       (440) 996-0064

ATTORNEYS FOR PLAINTIFF

## Local Rule 7.1(f) Certification

I hereby certify that the foregoing above-captioned case pending in the United States District Court, Northern District of Ohio, Eastern Division, is as of this filing assigned to the Standard Track, and that the foregoing Memorandum of Point and Authorities in Opposition to Defendant's Motion for Summary Judgment complies with the requirements of Local Rule 7.1(f), as modified by the Court's non-document Order of November 19, 2021.

## Certificate of Service

I hereby certify that on January 10, 2022, I presented the foregoing document to the Clerk of the Court for filing and uploading into the EDMS system, which will send notification to the following EDMS system participants:

DAVID A. YOST
Attorney General of Ohio

Daniel J. Rudary
**BRENNAN, MANNA & DIAMOND, LLC**
75 E. Market Street
Akron, OH 44308
Phone: (330) 253-5060
Fax: (330) 253-1977
E-mail: djrudary@bmdllc.com

*Special Counsel for Defendant Kent State University*

*/s/ Britney DeFord*