## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN WILER, | ) | Case No. 5:20-cv-00490 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | |
| | ) | |
| KENT STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

This case arises from Plaintiff Kathleen Wiler's employment as the head coach of Defendant Kent State University's women's field hockey team. She alleges that Kent State violated the Equal Pay Act and Title VII by paying her less than her male counterparts. Defendant moves for summary judgment on both claims and regarding some of Plaintiff's requested relief. (ECF No. 53.) For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

## STATEMENT OF FACTS

At this stage of the proceedings, the record establishes the following facts, which the Court construes in the light most favorable to Plaintiff as the non-movant.

### A.     Coach Kathleen Wiler

Kathleen Wiler coached Kent State University's Division I women's field hockey team from March 2006 to February 2019. (ECF No. 56, PageID #1926.) As head coach, she had several responsibilities. Among other things, Coach Wiler supervised two assistant coaches, oversaw a roster of around twenty-five to twenty-

six players, and managed the team's budget—which often exceeded $800,000. (*Id.*, PageID #1928–30.) She did all this while leading her team through a twenty-game athletic season lasting nearly three months. (*Id.*, PageID #1930; ECF No. 52, PageID #1133.) During that competitive season, her team competed in the Mid-American Conference, also known as the MAC, against seven other schools. (ECF No. 52, PageID #1141.) During her time at the head of the program, Kent State dominated the MAC, winning eight regular season titles, five conference tournament titles, and making five NCAA post-season appearances. (ECF No. 56, PageID #1926; *see also* ECF No. 35-1, ¶ 17, PageID #367.)

**B.    Coach Wiler's 2016 Contract**

In June 2016, Coach Wiler signed a three-year contract with Kent State. (ECF No. 52-7, PageID #1175.) That contract provided three main components of compensation.

*First*, she received a base salary of $76,500.00. (*Id.*, PageID #1177.) That salary reflected a raise of over $5,000 from her previous year's base salary of $70,709.89. (ECF No. 52-5, PageID #1171.) In subsequent years, her raise increased. Coach Wiler's 2018 salary was $79,590.96, and her 2019 salary was $81,182.42. (ECF No. 52-9, PageID #1187; ECF No. 52-10, PageID #1188.) These two amounts placed her salary above the average MAC field hockey coach, who received $76,937.00 and $78,376.00 during those years. (ECF No. 52, PageID #1118–19.)

*Second*, her contract specified twelve performance bonuses. (ECF No. 52-7, PageID #1177.) For example, she could earn a $3,000 bonus if her team was the MAC Overall Regular Season Champion or if it was the MAC Tournament Champion. (*Id.*)

Her team's performance objectively determined whether Coach Wiler received these bonuses. (ECF No. 50, PageID #779–81.)

*Finally*, Coach Wiler—like all of Kent State's head coaches—could receive supplemental income by hosting sports camps. (ECF No. 52-7, PageID #1179; ECF No. 50, PageID #888–90.) The amount a coach earned from these camps depended on several factors, including how many camps she decided to hold, how many students attended the camp, and the University's overhead. (ECF No. 50, PageID #888–95.) Further, coaches could even allocate some of their camp income to their assistant coaches, which Coach Wiler did. (*Id.*, PageID #890.)

### C.  Other Coaches' Contracts

Three other head coaches—Roberto Marinaro (women's soccer), Eric Oakley (softball), and Jim Andrassy (wrestling)—also signed contracts with Kent State in the summer of 2016. None of these programs generated net revenue (ECF No. 56, PageID #1928), and each fell outside Kent State's priority list (*see* ECF No. 54, PageID #1885–86). Indeed, the only sports that Kent State prioritized from 2015 to 2019 were football, men's basketball, women's basketball, volleyball, men's golf, women's golf, and baseball. (*Id.*) As coaches of non-priority sports, each of these other head coaches, like Coach Wiler, had similar essential duties, expectations, and relative importance in Kent State's athletic program. (*Id.*, PageID #1885.)

Initially, Plaintiff identified three additional coaches as potential comparators: the women's volleyball coach, the former women's golf coach, and the women's gymnastics coach. (ECF No. 51, PageID #1106.) On summary judgment, however, Plaintiff focused her argument only on similarities to Coach Marinaro, Coach Oakley,

and Coach Andrassy. (ECF No. 57, PageID #2380.) Therefore, the Court limits the factual discussion and legal analysis to these coaches.

### C.1. Coach Roberto Marinaro (Women's Soccer)

Marinaro signed his contract first in 2016. Under his contract, Marinaro received a base salary of $76,200.00. (ECF No. 50-38; PageID #1042.) This figure represented a raise from his 2015 salary of $73,728.68. (ECF No. 52-58, PageID #1792.) By 2018, his salary increased to $79,278.48 (ECF No. 52-63, PageID #1823), and by 2019 it was $80,864.05. (ECF No. 52-65, PageID #1832.)

Coach Marinaro's contract also included thirteen performance bonuses. (ECF No. 50-38, PageID #1042.) Nine were the same as Coach Wiler's. (*Compare* ECF No. 52-7, PageID #1177, *with* ECF No. 52-60, PageID #1803.) Two paid a higher bonus (MAC East Champion and MAC Final Four Tournament), and two lower (MAC Overall Regular Season Champion and MAC Tournament Champion). (*Id.*)

### C.2. Coach Eric Oakley (Softball)

Next, Eric Oakley signed his contract in June 2016. (ECF No. 50-33, PageID #1026.) Like coaches Wiler and Marinaro, he too negotiated a base salary and performance bonuses. (*Id.*, PageID #1028.) Under his 2016 contract, Coach Oakley had a base salary of $72,000.00. (*Id.*) In 2018 and 2019, this amount increased to $73,440.00 and $74,908.80, respectively. (ECF No. 50-34, PageID #1037; ECF No. 50-35, PageID #1038.) Moreover, he had the opportunity to receive as many as twelve performance bonuses. (ECF No. 50-33, PageID #1028.) Nine were the same as Coach Wiler's. (*Compare* ECF No. 52-7, PageID #1177, *with* ECF No. 52-51,

PageID #1749.)  Only one was higher:  the bonus for winning the MAC East.  (ECF No. 50-33, PageID #1028.)

### C.3.  Coach Jim Andrassy (Wrestling)

The last coach to sign a 2016 contract was Jim Andrassy.  (*See* ECF No. 50-21, PageID #994.)  He had served as the wrestling team's assistant or head coach since 1994.  (ECF No. 52, PageID #1131.)  In 2016 he would be the head wrestling coach.  (ECF No. 50-21, PageID #994.)

The position came with several duties relevant here.  First, he had to oversee two assistant coaches and a team of approximately thirty-one to thirty-three athletes.  (ECF No. 56, PageID #1928–29.)  His team had a five-and-a-half-month competitive season with roughly twenty-five matches.  (ECF No. 52, PageID #1133; ECF No. 56, PageID #1930.)  Second, he had budgeting duties.  In 2018, he managed a budget of $641,859.74.  (*Id.*)

Coach Andrassy's 2016 contract provided him with a base salary of $81,100.00.  (ECF No. 50-21, PageID #996.)  That number climbed to $82,722.00 and $83,936.83 in 2018 and 2019, respectively.  (ECF No. 52-39, PageID #1695; ECF No. 52-41, PageID #1702.)  Meanwhile, the average base salary of a MAC wrestling coach was $82,224.00 in 2018 and $88,125.00 in 2019.  (ECF No. 52, PageID #1132–33.)  Additionally, his contract provided sixteen performance bonuses.  (ECF No. 50-21, PageID #996.)  Several, including MAC Coach of the Year and Highest Team GPA in the MAC, were higher than Coach Wiler's.  (*Compare id.*, *with* ECF No. 52-7, PageID #1177.)

### D.    Kent State's Salary Considerations

Although these contracts have varying terms, Defendant maintains that Kent State's athletic director, Joel Nielsen, set the coaches' base salaries using two common denominators.  The first is market data.  According to Defendant, Nielsen ascertained a coach's market rate using Win AD—a subscription database that details the salaries of thousands of coaches at NCAA Division I and Division II schools.  (ECF No. 52, PageID #1116–17.)  Armed with this data, Nielson determined the average salary for each sport and adjusted his offers to put Kent State's head coaches in the top half, if not the top three or four, for the particular sport of each.  (*Id.*, PageID #1114–17.)  Second is seniority.  Nielsen also considered coaches' tenure with Kent State.  (*Id.*, PageID #1115; ECF No. 54, PageID #1887.)

### E.    Coach Wiler's Request to Renegotiate

In early 2016, Coach Wiler attempted to renegotiate her contract, which was set to expire in June 2016.  (ECF No. 50, PageID #764–65.)  At that point in time, the field hockey team had won its third consecutive regular-season MAC championship, won the MAC tournament for the third time in a row, and appeared in the NCAA tournament.  (ECF No. 56, PageID #1926.)  Also at that time, Coach Wiler was the only female coach at Kent State and had the lowest base salary.  (*Id.*)  During negotiations, she raised concerns about these issues.  (*Id.*, PageID #1926–27.)

Coach Wiler submitted a written proposal to increase her base salary to $80,000 per year.  (*Id.*, PageID #1927; ECF No. 50, PageID #817–18.)  Nielson told Coach Wiler that he wanted to make sure she remained among the top three highest paid field hockey coaches in the MAC.  (ECF No. 50, PageID #763.)  Plaintiff claims

that, after she raised the issue of equal pay with Nielsen, he broke off negotiations (*Id.*, PageID #807), leaving Coach Wiler with a take-it-or leave it contract extension (ECF No. 56, PageID #1927).  Ultimately, Coach Wiler took the deal and signed the 2016 contract described above, which expired on February 28, 2019.  (ECF No. 52-7, PageID #1175.)

When Nielsen and Kent State failed to address her concerns about equal pay, Coach Wiler retained counsel in early 2017 to renegotiate her contract.  (ECF No. 56, PageID #1930.)  When that did not happen, she filed a discrimination charge with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission in September 2017.  (*Id.*; ECF No. 50, PageID #907–09.)  Kent State did not take remedial action; therefore, Coach Wiler resigned, effective February 28, 2019.  (ECF No. 56, PageID #1931.)  When she resigned, Coach Wiler had been one of the top three highest-paid field hockey coaches in the MAC during the three-year term of the 2016 contract.  (ECF No. 52, PageID #1123.)

## STATEMENT OF THE CASE

Following her resignation, Plaintiff filed suit, on March 3, 2020, asserting causes of action for (1) wage discrimination and constructive discharge/retaliation in violation of Title VII, (2) violation of the Equal Pay Act, and (3) violation of Title IX. (ECF No. 35-1, ¶¶ 101–30, PageID #383–87.)  Included in Count IV of Plaintiff's complaint is a request for post-resignation back pay and front pay.  (ECF No. 35-1, ¶ 131, PageID #388.)

Defendant moved to dismiss.  (ECF No. 13.)  Construing that motion as a motion for judgment on the pleadings, the Court granted Defendant's motion in part.

(ECF No. 38.)  As a result, only claims for wage discrimination under the Equal Pay Act (Count II) and Title VII (Count I) remain.  Defendant now moves for summary judgment.  (ECF No. 53.)

## ANALYSIS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court must view evidence in the light most favorable to the non-moving party.  *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

After discovery, summary judgment is appropriate if the non-moving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial."  *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* (citing *Celotex Corp.*, 477 U.S. at 322).  Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Id.* However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48). In determining whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). Ultimately, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251.

## I.  Wage Discrimination

Plaintiff brings wage discrimination claims under the Equal Pay Act and Title VII of the Civil Rights Act of 1964. (ECF No. 35-1, ¶¶ 101–19, PageID #383–85.) Put simply, she alleges that Defendant violated these statutes by paying her less than her male counterparts because of her sex. (*Id.*)

Historically, courts analyzed claims for wage discrimination under the Equal Pay Act and Title VII using the same analytical framework. *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). Now, the analytical frameworks possess some variation. *See Briggs v. University of Cincinnati*, 11 F.4th 498, 509 n.2 (6th Cir. 2021). Most notably, the Sixth Circuit recognizes that the "burdens of production and

persuasion are allocated differently in the two types of claims" after a plaintiff establishes her *prima facie* case.  *Id.*; *Rogers v. Bridges Rehab. Servs. LLC*, No. 1:18-CV-728, 2019 WL 5731016, at *5 (N.D. Ohio Nov. 5, 2019).  Cognizant of these differing standards, the Court addresses each claim separately, beginning with Plaintiff's Equal Pay Act claim.

### I.A.    Equal Pay Act

The Equal Pay Act prohibits employers from discriminating "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [it] pays wages to employees of the opposite sex . . . for equal work" on jobs that require "equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d).  For her part, Plaintiff alleges that coaches Eric Oakley, Roberto Marinaro, and Jim Andrassy were all paid more than her for equal work.  (ECF No. 57, PageID #2378–79 & #2389.)  Defendant moves for summary judgment arguing that (1) this claim extends back only to March 3, 2018; (2) Plaintiff cannot state a *prima facie* case; and (3) even if Plaintiff states a *prima facie* case, Defendant relied on factors "other than sex."  The Court addresses each argument in turn.

### I.A.1. Limitations Period

In addition to disputing the merits of this claim, the parties disagree over the time period at issue.  They dispute both the date from which the Court should count back and how many years back the limitations period extends.

10

### I.A.1.a. Starting Point

Defendant argues that the Court should apply the limitations period from the date when Plaintiff filed her complaint in federal court.  (ECF No. 53-1, PageID #1875.)  Plaintiff contends that the Court should use the date on which she filed her complaint with the EEOC.  (ECF No. 57, PageID #2392.)  Because the Equal Pay Act does not require exhaustion of administrative remedies, *Washington v. Gunther*, 452 U.S. 161, 175 n.14 (1981), Plaintiff was free to commence suit alleging a violation of the Act even while her other claims were before the EEOC.  For this reason, the federal courts generally apply the limitations period from the date of filing a complaint in court, not with the EEOC.  *See Gandy v. Sullivan Cnty., Tenn.*, 24 F.3d 861, 865 (6th Cir. 1994) (running limitations period from commencement of the action in federal court); *Jones v. Trane US, Inc.*, No. 3:19-0453, 2020 WL 5088211, at *9 (M.D. Tenn. Aug. 28, 2020); *Gehrt v. University of Ill. at Urbana-Champaign Co-Op. Extension Serv.*, 974 F. Supp. 1178, 1189 (C.D. Ill. 1997) (collecting cases).  Therefore, the Court will apply the applicable limitations period from March 3, 2020, the date on which Plaintiff commenced suit in federal court.  (ECF No. 1.)

### I.A.1.b. Willful Violation

The Equal Pay Act has a two-year limitations period, except in the case of a willful violation, which has a three-year limitations period.  29 U.S.C. § 255(a).  Plaintiff contends that Kent State's violation was willful, triggering application of the three-year statute of limitations.  (ECF No. 57, PageID #2392.)  A violation is willful where a defendant "either knew or showed reckless disregard for the matter of

whether its conduct was prohibited by the statute." *Jones*, 2020 WL 5088211, at *10 (citing *McLaughlin v. Richard Shoe Co.*, 486 U.S. 128, 133 (U.S. 1988)).  Under that standard, a plaintiff must provide "more than proof of merely a violation" of the Equal Pay Act.  *Id.*

Plaintiff argues that she meets this standard.  She points to the 2016 contract negotiations in which Coach Wiler raised the issue of unequal pay with Nielson.  (ECF No. 50, PageID #807.)  Factually, construing the record in favor of Plaintiff, as the Court must on a motion for summary judgment, a jury could find a willful violation based on this record.  However, the question is whether these facts make out a claim for willfulness as a matter of law.  Plaintiff relies on *Brooks v. Tire Discounters, Inc.*, No. 3:16-cv-02269, 2018 WL 1243444, at *8 (M.D. Tenn. March 8, 2018), which ties willfulness to "evidence . . . that the employer . . . was placed on notice that its conduct might violate the statute . . . by prior complaints or lawsuits brought by employees." According to Plaintiff, that is what occurred here.  (*See* ECF No. 57, PageID #2392.)

*Brooks* describes five examples from other cases illustrating when an employer is placed on notice such that a violation is willful.  *See Brooks*, 2018 WL 1243444, at *8 (collecting cases).  These examples all involve defendants that (1) had been investigated for past violations, (2) previously agreed to pay unpaid wages, and (3) provided assurances of future compliance.  *See id.*  But these are all easy cases. Here, the record presents a circumstance where the defendant's knowledge arises from prior notice from the same employee—not its own prior undertakings or commitments, an EEOC or other investigation, or a complaint from another

12

employee.  As a matter of law, the facts on which Plaintiff relies to establish a willful violation (if a jury credits them) create a situation where every violation is willful so long as the plaintiff complained about her own treatment before an adverse action prompting a lawsuit.  That position improperly converts every violation to a willful one and finds no support in the law.  Therefore, the Court applies a two-year statute of limitations that extends back two years from the date on which Plaintiff filed her complaint—March 3, 2020.  (ECF No. 1.)  To the extent Plaintiff seeks damages or bases her claim on facts occurring before that date, her claim is time-barred.

### I.A.2. *Prima Facie* Case

To establish a *prima facie* case of wage discrimination under the Equal Pay Act, a plaintiff must show that her employer pays employees of the opposite sex at a higher rate for equal work on jobs that require equal skill, effort, and responsibility and that are performed under similar working conditions.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 987 (6th Cir. 1992).

Plaintiff argues that coaches Eric Oakley, Roberto Marinaro, and Jim Andrassy were all paid at a higher rate for equal work.  (ECF No. 57, PageID #2378–79 & #2389.)  In fact, she argues that in 2018, the last full year she worked at Kent State, Coach Wiler was the lowest paid of these coaches based on the pay stubs of each:

|            | 2018 Compensation |
|------------|-------------------|
| Oakley     | $93,943.12        |
| Marinaro   | $99,063.04        |
| Andrassy   | $106,891.60       |
| Wiler      | $87,377.30        |

(*Id.*, PageID #2379; *see also* ECF No. 56, PageID #1928; ECF No. 56-3, PageID #1982–2005; ECF No. 56-4, PageID #2078–2101; ECF No. 56-5, PageID #2154–77; ECF No. 56-6, PageID #2250–73.)  Defendant objects to use of the pay stubs as evidence because Plaintiff has not properly authenticated them.  (ECF No. 58, PageID #2399 n.2.)  But Defendant does not dispute the authenticity of the pay stubs and, by raising the issue only in a footnote, forfeits the argument.  *See Calvert v. Wilson*, 288 F.3d 823, 837 (6th Cir. 2002) (Cole, J., concurring) (collecting authorities).

Defendant disagrees with Plaintiff's calculations and argument for two reasons.  First, Defendant argues that Coach Oakley and Coach Marinaro were not paid at a higher rate (an argument that does not depend on the pay stubs).  (ECF No. 53-1, PageID #1861 & #1867.)  Second, Defendant argues that Coach Andrassy did not perform equal work.  (*Id.*, PageID #1861–62.)

### I.A.2.a. Higher Rate (Coach Oakley and Coach Marinaro)

To argue that Kent State paid Eric Oakley, Roberto Marinaro, and Jim Andrassy more than her, Plaintiff argues based on the coaches' higher *total compensation*.  (ECF No. 57, PageID #2379.)  As she defines it, total compensation includes the sum of a coach's base pay, performance bonuses, and camp income.  (*See*

14

*id.*; ECF No. 50-6, PageID #951–53.)  Defendant counters by pointing to the lower *base salaries* that Kent State paid to Coach Oakley and Coach Marinaro in 2018 and 2019.

"The [Equal Pay Act] and Sixth Circuit have made it clear that when comparing the compensation of male and female employees, the focus must be on their respective *rates of pay*, rather than their total compensation." *Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 755 (S.D. Ohio 2011), *aff'd*, 504 F. App'x 473 (6th Cir. 2012) (citing 29 U.S.C. § 206(d)(1), and *Bence v. Detroit Health Corp.*, 712 F.2d 1024 (6th Cir.1983)) (emphasis added).  Stated differently, courts must measure the amount of pay "against a common denominator."  *Bence,* 712 F.2d at 1027.  For example, a case involving commissioned salespeople turns on the employees' commission *rates*, not the total commissions paid.  *Jones*, 823 F. Supp. 2d at 755.  To identify the relevant common denominator, courts must perform a "practical inquiry which looks to the nature of the services for which an employer in fact compensates an employee."  *Bence*, 712 F.2d at 1027.

Based on the record before the Court, the coaches' base salaries and performance bonus rates supply the relevant common denominator.  In reviewing the employment contracts of Coach Wiler and the comparators, these components of compensation are the only rates of pay that Kent State negotiated or set.  (*See, e.g.,* ECF No. 50, PageID #892–95; ECF No. 52-6, PageID #1172.)

Beyond base salaries and performance bonuses, coaches derived the largest remaining share of their total compensation from camp income.  (ECF No. 52-7,

PageID #1179; ECF No. 50, PageID #888–90.)  But a coach had no obligation to run a camp, and the compensation earned from camps varied depending on a number of factors that Kent State did not dictate or necessarily control.  (ECF No. 50, PageID #892–95.)  Indeed, the record reflects that Coach Wiler "provided most of her income earned from field hockey camps" to her assistant coaches.  (*Id.*, PageID #890.)  Further, the coaches' contracts leave the camps' "final supplemental compensation amounts" to the head coach's discretion.  (*See, e.g.*, ECF No. 50-6, PageID #953.)  Where an employee exercises a significant degree of discretion or control over earning a portion of her income, that portion cannot comprise part of the common denominator for the base rate of pay.  A contrary conclusion risks incentivizing strategic behavior for artificial or leverage purposes.  Because Kent State did not set this amount, as a practical matter, it does not form part of the services for which the University compensated its coaches.

Using base salary and performance bonuses as the relevant common denominator to determinate rates of pay as part of Plaintiff's *prima facie* case, the following table summarizes the information from the record for Coach Wiler and each of the comparators she identifies for the years within the applicable limitations period:

| | Wiler | Oakley | Marinaro | Andrassy |
|---|---|---|---|---|
| **Base Salary ($)** | | | | |
| 2018 | 79,590.60 | 73,440.00 | 79,278.48 | 82,722.00 |
| 2019 | 81,182.42 | 74,908.80 | 80,864.05 | 83,962.83 |
| **Performance Bonus Rates ($)** | | | | |
| MAC Regular Season Champ | 3,000 | 2,500 | 2,500 | 2,500 |
| MAC Tournament Champion | 3,000 | 2,500 | 2,500 | 2,500 |
| MAC Coach of the Year | 1,000 | 1,000 | 1,000 | 2,000 |

| | | | | |
|---|---|---|---|---|
| NCAA Play-in Game Win | 1,000 | 0 | 0 | 0 |
| NCAA Tournament (per win) | 2,000 | 2,000 | 2,000 | 0 |
| NCAA Div-I Nat'l Champion | 10,000 | 10,000 | 10,000 | 10,000 |
| Overall Team GPA of 3.0–3.499; 3.5 and over | 1,000; 1,500 | 1,000; 1,500 | 1,000; 1,500 | 1,000; 1,500 |
| Highest Team GPA in MAC | 500 | 500 | 500 | 1,000 |
| COSIDA Academic All-Americans | 500 each | 500 each | 500 each | 0 |
| Regional Coach of the Year | 2,000 | 2,000 | 2,000 | 0 |
| National Coach of the Year | 5,000 | 5,000 | 5,000 | 3,000 |
| Top 20 RPI at the end of the season | 2,000 | 2,000 | 2,000 | 0 |
| MAC East Champion | 0 | 1,000 | 1,000 | 0 |
| MAC Final Four Tournament | 0 | 0 | 1,500 | 0 |
| Best Team out of the core MAC Teams | 0 | 0 | 0 | 1,000 |
| Individual MAC Champion | 0 | 0 | 0 | 500 each |
| Individual NCAA Champion | 0 | 0 | 0 | 2,000 each |
| Qualifiers to NCAA Championship | 0 | 0 | 0 | 1,000 each |
| NWCA Academic All American | 0 | 0 | 0 | 500 each |
| Individual NCAA All-American | 0 | 0 | 0 | 1,000 each |
| Finish in Top 10 at NCAA Championship Team; Finish Top 5 | 0 | 0 | 0 | 3,000; 5,000 (not both) |
| Advance to National Duals | 0 | 0 | 0 | 1,000 |
| Advance to finals of National Duals | 0 | 0 | 0 | 2,500 |
| **Total 2018 Bonus Compensation Paid ($)** | 2,000 | 2,000 | 7,000 | 8,500 |
| **Total 2018 Compensation ($)** | 81,590.60 | 75,440.00 | 81,278.48 | 91,222.00 |

(ECF No. 50-21, PageID #996 (Andrassy bonus rates); ECF No. 50-34, PageID #1037

(Oakley 2018 salary); ECF No. 50-35, PageID #1038 (Oakley 2019 salary); ECF

No. 50-57, PageID #1099 (2018 bonus compensation paid); ECF No. 52-7,

PageID #1177 (Wiler bonus rates); ECF No. 52-9, PageID #1187 (Wiler 2018 salary);

ECF No. 52-10, PageID #1188 (Wiler 2019 salary); ECF No. 52-39, PageID #1695

(Andrassy 2018 salary); ECF No. 52-41, PageID #1702 (Andrassy 2019 salary); ECF

No. 52-51, PageID #1749 (Oakley bonus rates); ECF No. 52-60, PageID #1803 (Marinaro bonus rates); ECF No. 52-63, PageID #1823 (Marinaro 2018 salary); ECF No. 52-65, PageID #1832 (Marinaro 2019 salary).)

### I.A.2.a.i. Coach Eric Oakley

Defendant argues that it did not pay its softball coach, Eric Oakley, at a higher rate than Coach Wiler. (ECF No. 53-1, PageID #1861.) The base salary and performance bonus rates do not show that Kent State paid Coach Oakley at a higher rate. First, Coach Oakley's base salary for 2018 and 2019 ($73,440.00 and $74,908.80) was lower than Coach Wiler's ($79,590.60 and $81,182.42). (*Compare* ECF No. 50-34, PageID #1037, *and* ECF No. 50-35, PageID #1038, *with* ECF No. 52-9, PageID #1187, *and* ECF No. 52-10, PageID #1188.) Second, Coach Oakley's performance bonus rates substantially equal those offered to Coach Wiler—nine of his twelve performance bonus rates were the same. (*Compare* ECF No. 52-7, PageID #1177, *with* ECF No. 52-51, PageID #1749.) In fact, Coach Oakley's rate was *lower* on two of the three items where the rates were not equal. (*Id.*) Therefore, no reasonable jury could find that Kent State paid Coach Oakley at a higher rate, and Coach Oakley is not an appropriate comparator.

Nor does the bonus offered to Coach Oakley for winning the MAC East change this conclusion. The record reflects that the MAC is not separated into regions for field hockey. According to Nielsen, "only five MAC schools and (two MAC affiliates) had field hockey teams." (*See* ECF No. 52, PageID #1141.) Accordingly, Kent State

could not have offered Coach Wiler such a comparable bonus. For these reasons, Coach Oakley is not a comparator for evaluation of Plaintiff's *prima facie* case.

### I.A.2.a.ii. Coach Roberto Marinaro

Defendant also argues that it did not pay women's soccer coach Roberto Marinaro at a higher rate than Coach Wiler. (ECF No. 53-1, PageID #1861.)

The Court's analysis for Coach Marinaro is largely the same as Coach Oakley's. He too had a lower base salary ($79,278.48 and $80,864.05) than Coach Wiler ($79,590.60 and $81,182.42) in 2018 and 2019. (*Compare* ECF No. 52-63, PageID #1823, *and* ECF No. 52-65, PageID #1832, *with* ECF No. 52-9, PageID #1187, *and* ECF No. 52-10, PageID #1188.) Moreover, nine of his thirteen performance bonus rates were the same as Coach Wiler's. (*Compare* ECF No. 52-7, PageID #1177, *with* ECF No. 52-60, PageID #1803.)

Of the four performance bonus rates that were not the same for Coach Wiler and Coach Marinaro, only two favored Coach Marinaro. (*Id.*) First, like Coach Oakley, Coach Marinaro had the potential for a bonus for winning the MAC East. (ECF No. 52-60, PageID #1803.) Again, the unavailability of regions for field hockey explains this difference. Second, in Coach Marinaro's 2016 contract, Kent State offered a performance bonus of $1,500 if his team advanced to the MAC Final Four Tournament. (*Id.*) Coach Wiler's contract contained no such bonus. (ECF No. 52-7, PageID #1177.) On the other hand, two performance bonuses favor Coach Wiler: MAC Overall Regular Season Champion and MAC Tournament Champion. (*Compare id.*, PageID #1177, *with* ECF No. 52-60, PageID #1803.) If anything, Coach

Wiler had a greater likelihood of achieving at least one of her targets, and these differences on the margins do not, in the Court's view, permit a reasonable jury to conclude that Coach Marinaro received a higher rate of pay for his performance bonuses.

Because Plaintiff cannot show that Kent State paid Coach Marinaro at a higher rate for base salary or performance bonuses, he is not an appropriate comparator.

### I.A.2.a.iii. Coach Jim Andrassy

Defendant does not dispute that it paid men's wrestling coach Jim Andrassy at a higher rate than Coach Wiler.  (*See* ECF No. 53-1, PageID #1866; ECF No. 58, PageID #2402.)  Indeed, the record demonstrates as much.  First, he received a higher base salary:  in 2018 and 2019, Coach Andrassy made $82,722.00 and $83,962.83, respectively, while Coach Wiler made $79,890.60 and $81,182.41.  (*Compare* ECF No. 52-39, PageID #1695, *and* ECF No. 52-41, PageID #1702, *with* ECF No. 52-9, PageID #1187, *and* ECF No. 52-10, PageID #1188.)   Second, several of his performance bonus rates were higher.  Coach Andrassy stood to receive $2,000 if he won MAC Coach of the Year and $1,000 if his team had the highest GPA in the MAC.  (ECF No. 50-21, PageID #996.)  For the same accomplishments, Coach Wiler could receive only $1,000 and $500.  (ECF No. 52-7, PageID #1177.)  Further evidence of Coach Andrassy receiving higher performance bonus rates lies in the sheer number of his potential bonuses.  In total, Coach Andrassy's contract contains sixteen performance bonuses, totaling more than those potentially available to Coach Wiler,

whose contract contains only twelve.  (ECF No. 50-21, PageID #996; ECF No. 52-7, PageID #1177.)  Accordingly, a reasonable jury could find that Kent State paid Coach Andrassy at a higher rate, meeting this aspect of Plaintiff's *prima facie* case.

### I.A.2.b. Equal Work (Coach Andrassy)

Under the Equal Pay Act, a plaintiff must show that her comparators performed "equal work on jobs . . . requir[ing] equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works*, 417 U.S. at 195.  "Precise equivalence is not required.  Rather, there need be 'only substantial equality of skill, effort, responsibility, and working conditions.'" *Conti v. Universal Enters., Inc.*, 50 F. App'x 690, 696 (6th Cir. 2002) (quoting *Odomes*, 653 F.2d at 250).

In determining whether coaching positions are substantially equal, courts consider several factors.  *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 800 (S.D. Ohio 1998), *aff'd*, 194 F.3d 1315 (6th Cir. 1999).  Some focus on numbers.  For example, the Court may compare team size, number of assistant coaches, spectator attendance and community interest, and the amount of revenue the sport generates. *Id.*  Other factors involve less quantitative measures, such as recruiting responsibilities, the degree of responsibility in public and media relations and promotional activities, and the relative importance of the sport in the athletic program. *Id.*

The parties dispute whether Plaintiff has demonstrated that her comparators performed "equal work."  (ECF No. 53-1, PageID #1861–62; ECF No. 57,

PageID #2380–85.) Because the record establishes that Coach Andrassy is the only proposed comparator Kent State paid at a higher rate, the Court limits this analysis to him.

### I.A.2.b.i. The Numbers

The record demonstrates substantial equality in numbers between the positions of Coach Wiler and Coach Andrassy. With respect to team size, in 2017 and 2018, Coach Wiler's field hockey team carried a roster of twenty-five to twenty-six players, and Coach Andrassy's wrestling team rostered thirty-one to thirty-three players. (ECF No. 56, PageID #1929.) While not precisely equal, the roster difference is sufficiently close such that a reasonable jury may find them substantially equal. Regarding assistant coaches, Coach Wiler and Coach Andrassy each supervised two assistant coaches. (*Id.*, PageID #1928.) Finally, neither sport generated net revenue. (*Id.*)

### I.A.2.b.ii. Other Considerations

Similarly, the record permits a rational jury to find substantial equality regarding the coaches' duties, responsibilities, and relative importance. For example, at his deposition, Nielsen explained Kent State's differentiation between priority and non-priority sports. (*See* ECF No. 54, PageID #1885–86.) Priority sports are designated externally—by the MAC—and internally—by the school. (*Id.*) From 2015 to 2019, the priority sports at Kent State were football, men's basketball, women's basketball, volleyball, men's golf, women's golf, and baseball. (*Id.*) Field hockey and men's wrestling did not make the list. According to Nielsen, coaches of non-priority

sports possessed similar essential job duties and expectations.  (*Id.*, PageID #1885–86.)  Based on his testimony and this record, a jury could find that the two sports shared the same relative importance in the program.

### I.A.2.b.iii. Defendant's Arguments

Defendant advances two arguments that coaches Wiler and Andrassy did not perform equal work.

*First*, Defendant briefly argues in reply, that Coach Wiler could not have performed equal work because there is no evidence that she was qualified to coach her comparator's sports.  (ECF No. 58, PageID #2402–03.)  But the Court will not entertain an argument made for the first time in reply.  *ECIMOS, LLC v. Nortek Glob. HVAC, LLC*, 736 F. App'x 577, 584 (6th Cir. 2018).  On the merits, however, this argument relies on out-of-circuit precedent for which the Court can find no analogous controlling authority.  Under the governing framework for analyzing equal work, the law requires only substantial equality, not precise equivalence.

*Second*, Defendant suggests that Coach Andrassy had more responsibilities, pointing to two differences between field hockey and men's wrestling at Kent State.  The sports have different seasons:  "the field hockey regular season typically lasts less than three full months . . . [while] the wrestling season extends some five-and-a-half to six months."  (ECF No. 53-1, PageID #1866.)  But Plaintiff responds that the sports have a similar number of competitions—twenty-five matches for wrestling and twenty field hockey games.  (ECF No. 56, PageID #1930.)  Also, wrestling had operating revenues three to four times higher than field hockey (*id.*), but Plaintiff

23

maintains that field hockey's larger budget ($857,113.56 versus $641,859.74 in 2018) required more budgeting duties and responsibility (*id.*, PageID #1929–30).

As a matter of law, neither of the differences to which Defendant points entitles it to entry of judgment in its favor. Based on these (or other) facts, a reasonable jury might well determine that these sports and the positions of Coach Wiler and Coach Andrassy are not substantially similar. Or it might find they are. That decision rests with the jury as the finder of fact.

*    *    *

For these reasons, the Court concludes that the record presents genuine disputes of material fact regarding whether Coach Wiler and Coach Andrassy performed substantially equal work. Because a reasonable jury may find that Coach Andrassy was paid at a higher rate for equal work, Plaintiff establishes a *prima facie* case of pay discrimination under the Equal Pay Act.

### I.A.3. Factors Other Than Sex

After a plaintiff establishes a *prima facie* case under the Equal Pay Act, the burden shifts to the defendant. *Corning Glass Works*, 417 U.S. at 196. "[The defendant's] burden is a 'heavy one.'" *Bence,* 712 F.2d at 1029. It must prove, by a preponderance of the evidence, that one of the four affirmative defenses set forth under the Equal Pay Act justifies the rate differential: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality; or (4) any factor other than sex. 29 U.S.C. § 206(d)(1); *Briggs*, 11 F.4th at 508. To succeed on a motion for summary judgment, the defendant must establish its defense "so clearly

24

that no rational jury could have found to the contrary." *Foco v. Freudenberg-NOK Gen. P'ship*, 549 F. App'x 340, 344 (6th Cir. 2013) (cleaned up).

Here, Defendant relies on two factors "other than sex." *First*, Defendant argues that Nielsen relied on market data when providing Coach Andrassy a higher base salary than Coach Wiler. (ECF No. 53-1, PageID #1876.) Defendant's market data came from Win AD—a subscription database that reviews the salaries paid to head coaches of each sport within the MAC. (ECF No. 52, PageID #1117–19.) Using Win AD's data, Nielsen offered each coach a base salary above the sport's average. (*Id.*, PageID #1119.) For 2018 and 2019, the average base salary of MAC field hockey coaches was $76,937.00 and $78,376.00, respectively. (*Id.*, PageID #1118–19.) Meanwhile, the average base salary of MAC wrestling coaches was $82,224.00 and $88,125.00. (*Id.*, PageID #1132–33.) *Second*, according to Defendant, Nielsen considered Coach Andrassy's greater seniority when setting his higher base salary. (ECF No. 53-1, PageID #1869–70; ECF No. 58, PageID #2406.) Coach Andrassy worked at Kent State twelve years longer than Coach Wiler. (ECF No. 58, PageID #2407; *compare* ECF No. 52, PageID #1131, *with* ECF No. 56, PageID #1926.) Plaintiff does not dispute that Nielsen referenced Win AD. Indeed, Coach Wiler noted during her deposition that Nielsen "had a metric" and that "he would have his assistant pull up . . . Win AD." (ECF No. 50, PageID #784–85.) Similarly, Plaintiff does not dispute that Defendant considered Coach Andrassy's seniority.

Under the Equal Pay Act, these facts provide defenses. 29 U.S.C. § 206(d)(1). Courts within the Sixth Circuit and elsewhere recognize that that these factors may

25

sufficiently explain wage rate differentials. *See, e.g.*, *Corning*, 417 U.S. at 204; *Weaver*, 71 F. Supp. 2d at 802; *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1322 (9th Cir. 1994). For these reasons, Defendant posits that it has carried its burden of proving a defense by a preponderance of the evidence, entitling it to a judgment as a matter of law. (ECF No. 53-1, PageID #1876.)

This argument falters in the face of the heavy burden Defendant bears in the current procedural posture. On the record presented, a reasonable jury might well find in favor of Defendant. However, a finder of fact could also determine otherwise. The record would allow the jury to find that Kent State has failed to account for Coach Andrassy's higher bonus *rates* or his greater number of bonus opportunities for reasons other than sex. In short, this record would permit a jury to find that those differences stem from unlawful sex discrimination.

Also, Defendant relies on Coach Wiler's testimony, in which she could not "testify that her (or any other coach's) incentive payments . . . [were] the product of sex-based compensation practices." (*Id.*, PageID #1877.) Factually, Defendant faults Coach Wiler for not having proof of unlawful discrimination, which is the subject of this suit. Legally, reliance on Coach Wiler's testimony attempts to shift the burden that Defendant bears once Plaintiff established her *prima facie* case.

\*      \*      \*

Accordingly, the Court determines that Defendant has not carried its burden of establishing a defense to Plaintiff's claim under the Equal Pay Act. For all the

foregoing reasons, the Court **DENIES** Defendant's motion for summary judgment on Count II.

### I.B.    Title VII

Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  To demonstrate impermissible wage discrimination under Title VII, a plaintiff may put forward direct evidence or rely instead on circumstantial evidence.  Here, Plaintiff opts for the latter.  "Title VII claims based on circumstantial evidence of discrimination are analyzed under the familiar three-step framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Briggs*, 11 F.4th at 508.  Step one requires that the plaintiff establish a *prima facie* case of discrimination.  Under step two, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the pay difference.  Finally, step three requires that the plaintiff demonstrate that the defendant's justification is a mere pretext for unlawful discrimination.

Plaintiff claims that Defendant discriminatorily paid her less than her male counterparts.  (ECF No. 35-1, ¶¶ 101–09, PageID #383–84.)  Defendant moves for summary judgment, arguing that (1) Plaintiff cannot state a *prima facie* case under Title VII; (2) even if she can, Defendant has "legitimate, non-discriminatory reasons" for the pay difference; and (3) Plaintiff cannot show that such reasons are merely pretextual.

### I.B.1. Limitations Period

Under the statute, a plaintiff may obtain relief (back pay) for unlawful wage discrimination for the two years preceding the filing of a timely discrimination charge. 42 U.S.C. § 2000e-5(e)(3)(B); *Gilmore v. Macy's Retail Holdings*, No. CIV. 06-3020 (JBS), 2009 WL 305045, at *3 (D.N.J. Feb. 4, 2009). Plaintiff filed her first charge of discrimination with the Ohio Civil Rights Commission and the EEOC by September 5, 2017. (ECF No. 50, PageID #907–09.) Accordingly, Plaintiff's Title VII claim relates to the period from September 5, 2015, to February 28, 2019—the date of her resignation.

### I.B.2. *Prima Facie* Case

To establish a *prima facie* case of discrimination, a plaintiff must demonstrate that she (1) belongs to a protected class; (2) suffered an adverse employment action; (3) was qualified for the job; and (4) was treated differently than similarly situated employees from a nonprotected class. *McDonnell Douglas*, 411 U.S. at 802; *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995).

Defendant contests only element four, arguing that Plaintiff's proposed comparators were not treated differently and are not similarly situated. (ECF No. 53-1, PageID #1861–68; ECF No. 58, PageID #2399–2403.) Essentially, Defendant makes substantially similar arguments to those advanced against Plaintiff's *prima facie* claim under the Equal Pay Act. *See Conti*, 50 F. App'x at 698 (describing how a Title VII wage discrimination claim ordinarily requires that a plaintiff show that her employer paid different wages to employees of opposite sexes for substantially equal work); *Rogers*, 2019 WL 5731016, at *5 (explaining that the

difference between claims under Title VII and the Equal Pay Act emerges only *after* the plaintiff's *prima facie* case).  For the reasons already explained, Plaintiff has established a *prima facie* case as to Coach Andrassy.

Additionally, Plaintiff satisfies her *prima facie* Title VII case as to Coach Marinaro.  For a portion of 2015 and 2016, he received a higher base salary ($73,728.68) than Coach Wiler ($70,709.89).  (*Compare* [ECF No. 52-5](#), PageID #1171, *with* [ECF No. 52-58](#), PageID #1792.)  Defendant contends that Coach Marinaro is not similarly situated to Coach Wiler because eleven other colleges and universities in the MAC have women's soccer teams, while only four others have field hockey programs.  ([ECF No. 53-1](#), PageID #1867.)  Also, Defendant argues that women's soccer generates three times as much revenue as field hockey.  (*Id.*, PageID #1868.) These arguments are unavailing.  The number of MAC teams might make achieving certain bonus targets marginally more difficult for Coach Marinaro, but Defendant has not made an argument that it materially changes the duties of either coach.  As for the greater revenue women's soccer generates, that factor favors Defendant but does not alone make Coach Marinaro an inadequate comparator.  In any event, the Court cannot say as a matter of law that Coach Marinaro is not similarly situated to Coach Wiler based on the differences to which Defendant points, though a jury might find for Plaintiff or Defendant on that question.

### I.B.3. Legitimate, Non-Discriminatory Reason

Once a plaintiff establishes a *prima facie* case, "[t]he burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions." *Briggs*, 11 F.4th at 508.  This standard is lower than that required by the

Equal Pay Act. *See id.* at 513. It requires only that a defendant provide some "admissible evidence that 'if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Id.* at 508 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)).

With respect to Coach Marinaro, Defendant points to Nielson's use of Win AD to set Coach Wiler's salary and Coach Marinaro's twenty years of employment and prior professional soccer coaching experience. (*See* ECF No. 53-1, PageID #1868–71.) As for Coach Andrassy, Defendant again cites market data and seniority to support disparities in base salary between Coach Wiler and Coach Andrassy. (*See id.*; ECF No. 58, PageID #2406–07.) These justifications satisfy Defendant's burden to respond to Plaintiff's *prima facie* case.

### I.B.4. Pretext

When the burden shifts back to Plaintiff to show pretext, she must show by a preponderance of the evidence that the non-discriminatory reasons Defendant advances are merely a pretext for sex discrimination. *Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 843 (6th Cir. 2015). "[I]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all probative evidence in the light most favorable to the plaintiff." *Jackson v. VHS Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "A plaintiff meets her burden to show pretext by producing sufficient evidence from which the jury may reasonably reject the employer's explanation." *Myers v. U.S. Cellular Corp.*, 257 F. App'x 947, 954 (6th Cir. 2007) (cleaned up). In other words, "the plaintiff must introduce admissible evidence to show that the

proffered reason was not the true reason and that discriminatory animus was the true motivation driving the employer's decision." *Id.* (cleaned up).  A plaintiff can show pretext by demonstrating that an employer's proffered reasons (1) have no basis in fact, (2) did not actually motivate the employer's actions, or (3) are insufficient to motivate the employer's actions. *Miles v. South Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).  In this case, Plaintiff relies on variations of options two and three.

*First*, Plaintiff argues that market rate and seniority did not actually motivate Kent State's unequal compensation decisions and practices.  (ECF No. 57, PageID #2385–86.)  Plaintiff points to the factors, such as season length and operating revenue, on which, in her view, Kent State admits it relied when paying male coaches than her.  (*Id.*)  Plaintiff characterizes these factors as subjective, but they provide objective bases for measuring pay.  Further, Plaintiff misreads Defendant's argument.  Defendant advanced these considerations only to rebut Plaintiff's *prima facie* case that the other coaches to whom she pointed were not, in fact, similarly situated to Coach Wiler.  (*See* ECF No. 53-1, PageID #1863–68.)

*Second*, Plaintiff argues that Defendant's use of market data without more fails to provide a defense as a matter of law.  (ECF No. 57, PageID #2386.)  For this argument, Plaintiff relies on *Lewis v. Smith*, 255 F. Supp. 2d 1054, 1063 (D. Ariz. 2003), and maintains that it requires that Kent State assess the value of each coach's particular skills relative to the market.  (ECF No. 57, PageID #2386.)  Aside from the fact that another district court from outside this Circuit provides the foundation for

this argument, the employer in *Lewis* derived a market rate from the prior salaries of the relevant persons at issue.  *Lewis*, 255 F. Supp. 2d at 1062–63.  In other words, that baseline failed to take into account the employees' individual skills in the context of the market.  It also made the legal analysis circular.  In contrast, Kent State determines the market rate by reference to the average salaries of head coaches of each sport in the MAC, regardless of sex.  (ECF No. 52, PageID #1114–17.)

Logically, Plaintiff also argues that market rate and seniority are insufficient explanations for the differences in pay between Coach Wiler and coaches Marinaro and Andrassy.  In particular, Plaintiff objects to her base salary, which was only slightly above the MAC average for field hockey coaches, given her demonstrated record of success.  (ECF No. 57, PageID #2381–84 & #2387.)  The record shows that Coach Wiler's base salary in 2016 was $589.89 above the MAC average, while Coach Marinaro, whose team had won only one regular season and tournament championship, received $8,830.58 over the average.  (ECF No. 52-67, PageID #1842; ECF No. 56-1, PageID #1932.)  Further, Plaintiff argues that the coaches' seniority varied slightly—not enough to warrant a salary difference.  (*See* ECF No. 57, PageID #2381 & #2384.)  She runs seniority from the date when a person was named head coach.  (*See id.*)  By that metric, Marinaro served seventeen years, Andrassy served fifteen years, and Coach Wiler twelve years.  (ECF No. 49, PageID #675; ECF No. 50, PageID #849; ECF No. 56-1, PageID #1932.)  Defendant counts seniority from when the coaches joined the University's coaching staff, regardless of position.  (ECF

No. 58, PageID #2407.)  That baseline adds four years of seniority to Marinaro and nine to Andrassy.  (*See* ECF No. 52, PageID #1131 & #1138.)

Reviewing the record in the light most favorable to Plaintiff in the current procedural posture, as the Court must both on summary judgment and in evaluating pretext, the record is not so one sided that a reasonable finder of fact could come to but one decision that favors Defendant.  A jury might find that market rate, seniority, and potentially other permissible factors explain the salary differences.  But it might find that these considerations are a pretext for unlawful discrimination based on sex, and the record would permit it to do so.  Therefore, the Court determines that Plaintiff's Title VII claim presents genuine disputes of material fact for trial and **DENIES** Defendant's motion for summary judgment on Count I.

## II.    Post-Resignation Back Pay and Front Pay

In Count IV of her complaint, Plaintiff requests an award of *post-resignation* back pay and front pay on her claims under the Equal Pay Act and Title VII.  (ECF No. 35-1, ¶ 131, PageID #388.)  Defendant argues that it is entitled to a judgment as a matter of law denying that request.  (ECF No. 53-1, PageID #1877.)

"[A] Title VII plaintiff must establish either actual termination or constructive discharge to be eligible for an award of lost pay damages, whether front pay or back pay." *EEOC v. Freemen*, 626 F. Supp. 2d 811, 816 (M.D. Tenn. 2009) (citing *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 767 (6th Cir. 2008)).  Plaintiff resigned from her position.  Initially, Plaintiff maintained that her resignation amounted to a constructive discharge, the Court dismissed that claim.  (ECF No. 35-1, ¶ 34, PageID #369; ECF No. 38, PageID #449.)  Therefore, the record reflects only that Coach Wiler

voluntarily resigned.  (ECF No. 56, PageID #1931.)  Accordingly, there is no dispute that Coach Wiler cannot establish actual termination or constructive discharge.  As a matter of law, she may not recover post-resignation back pay or front pay. Additionally, Plaintiff offers no response to Defendant's motion for summary judgment on this issue.  Therefore, the Court **GRANTS** Defendant's motion for summary judgment on Count IV.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for summary judgment.  (ECF No. 53.)  Specifically, the Court **GRANTS** the motion as it relates to post-resignation back pay and front pay (Count IV) and **DENIES** the motion as it relates to Plaintiff's wage discrimination claims under the Equal Pay Act (Count II) and Title VII (Count I).

**SO ORDERED.**

Dated:  October 28, 2022

J. Philip Calabrese
United States District Judge
Northern District of Ohio